Filed 4/20/16 (review denied 8/22/16; reposted to include Supreme Court statements upon denial of review)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CAMPAIGN FOR QUALITY EDUCATION et al., | |
| Plaintiffs and Appellants, | A134423 |
| v. | |
| STATE OF CALIFORNIA et al., | (Alameda County Super. Ct. No. RG10524770) |
| Defendants and Respondents. | |
| MAYA ROBLES-WONG et al., | |
| Plaintiffs and Appellants, | |
| v. | A134424 |
| STATE OF CALIFORNIA et al. | |
| Defendants and Respondents; | (Alameda County Super. Ct. No. RG10515768) |
| CALIFORNIA TEACHERS ASSOCIATION, | |
| Intervener and Appellant. | |

In these consolidated appeals, appellants ask us to reinstate their claims in which they seek declaratory and injunctive relief on the ground that respondents are allegedly violating sections 1 and 5 of article IX of the California Constitution.[1] Appellants' claims are general in nature. They allege the constitutional sections provide for a judicially-enforceable right to an education of "some quality" for all public school children, and, alternatively, that the Legislature is currently violating its constitutional

---

[1] All further unspecified references to sections and articles refer to the California Constitution.

1

obligations to "provide for" and "keep up and support" the "system of common schools" by its current educational financing system. However, we find no support for finding implied constitutional rights to an education of "some quality" for public school children or a minimum level of expenditures for education, as appellants urge us to read into sections 1 and 5 of article IX. To the contrary, the language of these constitutional sections do not include qualitative or funding elements that may be judicially enforced by the courts. Rather, the constitutional sections leave the difficult and policy-laden questions associated with educational adequacy and funding to the legislative branch. Consequently, we must affirm the trial court's dismissal of the complaints as appellants have failed to state a claim for which judicial relief may be accorded them.

## FACTUAL AND PROCEDURAL BACKGROUND

The two lawsuits before us were deemed related but not consolidated in the trial court. In *Campaign for Quality Education v. State of California* (*CQE*), plaintiffs are several nonprofit associations and guardians ad litem for minor students attending public schools in California, as well as one adult taxpayer and homeowner and two adult taxpayers and homeowners who are parents of students attending public schools in California. Similarly, in *Maya Robles-Wong v. State of California* (*Robles-Wong*), plaintiffs are several nonprofit associations and guardians ad litem for several students attending public schools in California, as well as several California school districts. Intervener California Teachers Association filed a complaint-in-intervention in the *Robles-Wong* action. Defendants in each action are the State of California and various named persons sued in their official capacities as state officers.

In their operative complaints, all named plaintiffs and intervener (collectively appellants) seek declaratory and injunctive relief based, in pertinent part, on allegations that all named defendants (collectively respondents) are violating sections 1 and 5 of article IX. The overarching nature of the causes of actions sought to be reinstated are based on allegations that all public school children have a constitutional right to an education of "some quality," and, alternatively, that the Legislature is currently failing to meet its constitutional duty by employing an irrational educational funding scheme.

2

According to appellants, the Legislature's current method of funding education fails to ensure that all public school children have the opportunity to become educationally proficient according to current legislatively-mandated academic standards.

Resolving respondents' separate demurrer and motion for judgment on the pleadings, the trial court sustained the demurrer and granted the motion for judgment on the pleadings, without leave to amend, as to those portions of the causes of action alleging that respondents are violating sections 1 and 5 of article IX. The court granted appellants the right to amend their complaints relative to other causes of action, but appellants declined to do so. Accordingly, the court entered judgments dismissing the lawsuits in their entirety. Appellants' timely appeals ensued. [2]

## DISCUSSION

### I. Introduction

In ruling on a demurrer or motion for judgment on the pleadings, the trial court examines the pleading to determine whether it alleges facts sufficient to state a cause of action under any legal theory, with the facts being assumed true for purposes of this inquiry. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42 (*Committee for Green Foothills*); *Pang v. Beverly Hosp., Inc.* (2000) 79 Cal.App.4th 986, 989.) Our review is de novo. (*Committee for Green Foothills, supra,* 48 Cal.4th at p. 42; *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216 (*Schabarum*).) "[W]e treat the properly pleaded allegations of [the] complaint as true, and also consider those matters subject to judicial notice. [Citations.]" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1232.) "[T]he allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties. [Citation.] If there is any reasonable possibility

---

[2] In addition to the briefs filed by the parties, we have considered amici curiae briefs, in support of appellants' position, filed by Education Law Center and Campaign for Educational Equity, Teacher's College, Columbia University; Delaine Eastin and Jack O'Connell; Fight Crime: Invest in Kids California; Children Now, Education Trust-West & California Association of School Business Officials; and Maria Medina and Californians Together.

that plaintiff can state a good cause of action, it is error and an abuse of discretion to sustain the demurrer without leave to amend. [Citations.] However, leave to amend is properly denied if the facts and nature of plaintiffs' claims are clear and under the substantive law, no liability exists. [Citations.]" (*Beck v. County of San Mateo* (1984) 154 Cal.App.3d 374, 379.)

As noted, appellants limit their appeals to seeking reinstatement of those portions of the causes of actions that seek to impose liability on respondents for their alleged violations of sections 1 and 5 of article IX.[3] Appellants urge us to hold that their claims are justiciable in that if we were to remand the cases for trial, they would be able to demonstrate that the Legislature's current education finance system is in violation of the fundamental right to an education guaranteed by article IX, and, the legislative and executive branches of the state should be compelled to take "appropriate action under court supervision." However, even assuming the truth of the facts as alleged in the complaints, appellants have failed to state causes of action based on alleged violations of sections 1 and 5 of article IX by respondents.

## II. Principles of Constitutional Interpretation

"[I]t is well established that it is a judicial function to interpret the law, including the Constitution, and when appropriately presented in a case or controversy, to declare when an act of the Legislature or the executive is beyond the constitutional authority vested in those branches." (*Schabarum, supra,* 60 Cal.App.4th at p. 1213.) We must " ' "enforce the provisions of our Constitution and 'may not lightly disregard or blink at . . . a clear constitutional mandate.' " ' " (*County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 284-285.) " 'It is within the legitimate power of the judiciary, to declare

---

[3] Thus, we find that appellants have abandoned any challenge to the following trial court rulings: (1) dismissal of those portions of the causes of actions alleging equal protection violations (art. I, § 7(a)&(b); art. IV, § 16); and (2) dismissal of those portions of the cause of action alleging violations of article IX, section 6 [school financing], and alleging that "the State has failed to meet the requirement[s] of [a]rticle XVI, [s]ection 8(a), that '[f]rom all state revenues there shall first be set apart the monies to be applied by the State for support of the public school system.' "

4

the *action* of the Legislature unconstitutional, where that action exceeds the limits of the supreme law; but the Courts have no means, and no power, to avoid the effects of *non-action*.' " (*California State Employees' Assn. v. State of California* (1973) 32 Cal.App.3d 103, 109.) "Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. [Citations.] In other words, 'we do not look to the Constitution to determine whether the [L]egislature is authorized to do an act, but only to see if it is prohibited.' [Citation.] [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.' " (*Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691.)

In interpreting sections 1 and 5 of article IX, "our paramount task is to ascertain the intent of those who enacted it" by looking " 'to the language of the constitutional text . . . .' " (*Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 122.) We "cannot insert or omit words to cause the meaning of [the sections] to conform to a presumed intent that is not expressed. (Code Civ. Proc., § 1858 [[4]]; *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist*. (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) 'As a judicial body, it is our role to interpret the

---

[4] Code of Civil Procedure section 1858 reads: "In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted, and where there are several provisions or particulars, such a construction is, if possible, to be adopted, as will give effect to all."

5

[sections] as they are written.' [Citation.]" (*Knight v. Superior Court* (2005) 128 Cal.App.4th 14, 23 (*Knight*).)

### III. Sections 1 and 5 of Article IX Do Not Provide A Qualitative Education Element

Appellants contend the language and history of sections 1 and 5 of article IX, and seminal judicial decisions declaring public education to be a fundamental right, lead to the inexorable conclusion that public school students have a judicially-enforcible constitutional right to an education of "some quality." After addressing certain preliminary matters, we conclude that sections 1 and 5 of article IX do not provide for a education of "some quality" that may be judicially enforced by appellants.

First, there can be no doubt that the fundamental right to a public school education is firmly rooted in California law as it "has historically been accorded an ascendant position in this state. Indeed, at the very start, article IX of our 1849 Constitution created the office of Superintendent of Public Instruction; required the Legislature to encourage by all suitable means the promotion of intellectual, scientific, moral and agricultural improvement; required the Legislature to establish a system of common schools; and established a fund for the support of the common schools. (See Stats. 1849, p. 32.) . . . Section 1 of article IX of the Constitution now provides, as it has since 1879: 'A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement.' Section 5 of article IX presently mandates, as it has since 1879: 'The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established.' " (*California Teachers Assn. v. Hayes* (1992) 5 Cal.App.4th 1513, 1522 (*Hayes*).)

"The early case of *Ward v. Flood* (1874) 48 Cal. 36 [(*Ward*)], considered the provisions of the Constitution of 1849 relative to educational affairs which, in all material respects, [are] similar to the present Constitution. The Supreme Court said: 'The

6

opportunity of instruction at public schools is afforded the youth of the state by the statute of the state, enacted in obedience to the special command of the constitution of the state, directing that the legislature shall provide for a system of common schools, by which a school shall be kept up and supported in such district . . ., etc. ([A]rt. XIX, [former] [§] 3). The advantage or benefit thereby vouchsafed to each child, of attending a public school is, therefore, one derived and secured to it under the highest sanction of positive law. *It is therefore, a right — a legal right —* as distinctively so as the vested right in property owned is a legal right, and as such it is protected, and entitled to be protected by all the guarantees by which other legal rights are protected and secured to the possessor.' ([*Ward, supra,*] 48 Cal. at p. 50, italics added; quoted in *Piper v. Big Pine School Dist.* (1924) 193 Cal. 664, 670 [226 P. 926].)" (*Slayton v. Pomona Unified School Dist.* (1984) 161 Cal.App.3d 538, 548-549, fn. omitted.)

Second, there is no dispute that "our Constitution vests the Legislature with sweeping and comprehensive powers in relation to our public schools (*Hall v. City of Taft* [(1956)] 47 Cal.2d [177,] 179), including broad discretion to determine the types of programs and services which further the purposes of education ([*Hayes,*] *supra*, 5 Cal.App.4th at p. 1528)," and "such functions as educational focus, teaching methods, school operations, furnishing of textbooks and the like." (*Wilson v. State Bd. of Educ*. (1999) 75 Cal.App.4th 1125, 1134-1135 (*Wilson*); see *California Teachers Assn. v. Board of Trustees* (1978) 82 Cal.App.3d 249, 255 ["the curriculum and the courses of study included in the common state curriculum are not prescribed by the Constitution, but are details left to the discretion of the Legislature," and "[t]hey do not constitute a part of the system, but are simply a function of that system"].) And, as appellants admit, the Legislature, consistent with its constitutional authority, has addressed the quality of education to be afforded public school students. (See, e.g., Ed. Code, §§ 52052-52052.9 [Public School Performance Accountability Program], 60640-60649 [California Assessment of Student Performance and Progress], 60851-60852.2 [High School Exit Examination].)

Third, we agree with the general proposition, embodied in appellants' arguments, that an education of "some quality" accords with good public policy. However, the question in this case is not whether the concept of an education of "some quality" comports with good public policy. The question before us is whether the right to an education of "some quality" is enshrined, as a *constitutional* right, under sections 1 and 5 of article IX. Having properly framed the issue, we now analyze appellants' claims under well-settled principles that guide our interpretation of the California Constitution.

At the outset we note that our Supreme Court has not addressed the issue raised by appellants – to wit, whether the right to an education of "some quality" is enshrined under sections 1 and 5 of article IX. Appellants ask to find that such a constitutional right is judicially enforceable based on the language in sections 1 and 5 of article IX, and as found by courts in other states that have analyzed constitutional provisions similar to article IX. However, as we now discuss, we conclude the language of sections 1 and 5, when read singly or together, in the context of article IX, does not provide for such an enforceable right, based on our constitutional language and persuasive decisions of other states that have analyzed almost identical constitutional language. (See *Bonner v. Daniels* (Ind. 2009) 907 N.E.2d 516, 520 (*Bonner*); *Committee for Educ. Equality v. State* (Mo. 2009) 294 S.W.3d 477, 488 (*Committee for Educ. Equality*).)[5]

---

[5]  "In determining the meaning of a constitutional provision it will be presumed that those who framed and adopted it were conversant with the interpretation which had been put upon it under the constitution from which it was copied, and this is the rule even as to provisions taken from the constitutions of other states,—the judicial construction placed upon them in the states from which they are taken will be followed by the courts in the state which adopts them." (*Lord v. Dunster* (1889) 79 Cal. 477, 485.) In *Bonner*, the court analyzed the language in the Education Clause, Article 8, Section 1, of the Indiana Constitution of 1851, which reads: " 'Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; *it shall be the duty of the General Assembly* to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and *to provide, by law, for a general and uniform system of Common Schools*, wherein tuition shall be without charge, and equally open to all.' " (*Bonner, supra,* 907 N.E.2d at p. 520.) In *Committee for Educ. Equality*, the court analyzed the language in Article IX, section 1(a), of the Missouri Constitution of 1875, which reads: "A general diffusion of knowledge and

8

The current sections 1 and 5 were adopted as part of the California Constitution of 1879.  After section 1's "precatory introduction . . . stressing the importance of knowledge and learning to the preservation of a free government," the remaining text of sections 1 and 5 imposes two duties on the Legislature.  (*Bonner, supra,* 907 N.E.2d at p. 520.)  The first is the duty to encourage the promotion of intellectual, scientific, moral and agricultural improvement by "all suitable means."  ([§ 1].)  The second is the duty to provide for a system of common schools by which a free school shall be kept up and supported in each district  . . . .  (§ 5.)  Thus, section 1 "is general and aspirational," but makes no provision for how the Legislature is to achieve its goal except to use "all suitable means."  (*Bonner, supra,* 907 N.E.2d at p. 520; see *Committee for Educ. Equality, supra,* 294 S.W.3d at p. 489 ["[t]he aspiration for a 'general diffusion of knowledge and intelligence' concerns policy decisions, and these political choices are left to the discretion of the other branches of government"].)  Section 5 is "more concrete – the assignment of a specific task with performance standards"  (*Bonner, supra*, 907 N.E.2d at p. 521), namely, to create "a system of common schools," "free," and "kept up and supported in each district."  (§ 5.)  But, section 5 does not "delineate or identify any specific outcome standards to be achieved by the [Legislature's] performance of its duty to provide for a system of common schools."  (*Bonner, supra*, 907 N.E.2d at p. 521; see *Kennedy v. Miller* (1893) 97 Cal. 429, 432 ["[t]he term 'system,' " as used in article IX, section 5, "imports a 'unity of purpose as well as an entirety of operation, and the direction to the [L]egislature to provide "a" system of common schools means *one* system which shall be applicable to all the common schools within the state' "].)  "As can be seen from the text of [sections 1 and 5, the] language speaks only of a general duty to provide for a system of common schools and does not require the attainment of any standard of resulting educational quality.  The phrases ["a system of common schools,"

intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this state within ages not in excess of [21] years as prescribed by law."  (*Committee for Educ. Equality v. State, supra,* 294 S.W.3d at p. 488.)

"free," and "kept up and supported in each district"] do not require or prescribe any standard of educational achievement that must be attained by the system of common schools." (*Bonner, supra*, at p. 521.*)* Thus, we find no explicit textual basis from which a constitutional right to a public school education of a particular quality may be discerned.

Appellants seemingly acknowledge the absence of textual support for the inchoate right to a quality education that they assert here. As such, they argue that sections 1 and 5, when read together in the context of article IX, support a finding of an "implicit" right to an education of "some quality." However, we are not at liberty to infer the existence of a constitutional right based on well-established principles of constitutional interpretation that counsel otherwise. As our Supreme Court explained in *People ex rel. Brodie v. Weller* (1858) 11 Cal. 77, 86: "We do not . . . approve of the principle of constitutional construction, which seeks by vague surmises, or even probable conjecture, or general speculation of a policy not distinctly expressed, to control the express language of the instrument; since such mode would not unfrequently change the instrument from what its framers made it, into what Judges think it should have been. Chief Justice Marshall, in *Gibbons v. Ogden*, ([(1824) 22 U.S. 1,] 9 Wheat. 1) speaking of the federal constitution, says '[the framers], and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said [*id.* at p. 188];' " and, earlier, in *Sturges v. Crowninshield* (1819) 17 U.S. 122, 4 Wheat. 122, Chief Justice Marshall says "although the spirit of an instrument, especially of a constitution, is to be respected not less than its letter, yet the spirit is to be collected chiefly from its words" (17 U.S. at p. 202, 4 Wheat. at p. 202). And, more recently, in *Washington v. Glucksberg* (1997) 521 U.S. 702, the high court, in addressing the contours of a federal constitutional substantive due process claim, said that "[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field' [citation], lest the liberty protected . . . be subtly transformed into the policy

preferences of the members of this Court [citation]." (*Id*. at p. 720.) Consequently, as these decisions instruct, we reject appellants' invitation to glean, through surmise or speculation, an implicit right to educational adequacy from these sections. We hasten to add that our interpretation of sections 1 and 5 of article IX flows not only from the language of article IX itself, but from a consideration of its purpose. (See *Lungren v. Davis* (1991) 234 Cal.App.3d 806, 825 ["in construing the meaning of the constitutional provisions at issue, we must consider their purposes"].) " 'The proper province of a declaration of rights and constitution of government, after directing its form, regulating its organization and the distribution of its powers, is to declare great principles and fundamental truths, to influence and direct the judgment and conscience of legislators in making laws, rather than to limit and control them, by directing what precise laws they shall make.' " (*Ward, supra,* 48 Cal. at p. 55.) Sections 1 and 5 are "precisely of this character" (*Ward, supra,* at p. 55) - the sections declare "great principles and fundamental truths" (*ibid*.) but do not mandate the Legislature to act in a particular manner regarding what precise laws shall be made to implement these principles and truths. (See *Clausing v. San Francisco Unified School Dist.* (1990) 221 Cal.App.3d 1224, 1236-1237.) "We decline [appellants'] invitation to amplify the words and meaning of our Constitution as crafted by its framers and approved by its ratifiers." (*Bonner, supra*, 907 N.E.2d at p. 522.) [6]

---

[6] We see no significance to appellants' arguments based on isolated portions of the debates during the Constitutional Convention of 1879. If the constitutional language is "not ambiguous," as in this case, " ' "not even the most reliable document of [constitutional] history . . . may have the force of law." [Citation.]' [Citation.]" (*Knight, supra*, 128 Cal.App.4th at p. 23.) It is only "[i]f doubts and ambiguities remain then, and only then, are we warranted in seeking elsewhere for aid." (*State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 462.)

We also find distinguishable *Hartzell v. Connell* (1984) 35 Cal.3d 899 (*Hartzell*), cited by appellants. In *Hartzell*, our Supreme Court found that a school's imposition of fees for extracurricular activities violated the "free school" guarantee in section 5 of article IX because the activities, although not required for graduation, constituted an integral component of public education. (*Id*. at pp. 909-913.) However, the court did not find that the constitution required such extracurricular activities had to be provided by a

11

We conclude our discussion here with the views expressed by the Illinois Supreme Court, in *Committee for Educ. Rights v. Edgar* (Ill. 1996) 174 Ill.2d 1 [672 N.E.2d 1178] (*Committee for Educ. Rights*),[7] when rejecting a claim similar to the one appellants assert here: "It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution in any meaningful sense. Nor is education a subject within the judiciary's field of expertise, such that a judicial role in giving content to the education guarantee might be warranted. Rather, the question of educational quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion. [¶] To hold that the question of educational quality is subject to judicial determination would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals in [the State]. Judicial determination of the type of education children should receive and how it can best be provided would depend on the opinions of whatever expert witnesses the litigants might call to testify and whatever other evidence they might choose to present. Members of the general public, however, would be obliged to listen in respectful silence. We certainly do not mean to trivialize the views of educators, school administrators and others who have studied the problems which public schools confront. But nonexperts – students, parents, employers and other[s] – also have important views and experiences to contribute which are not

public school. The court held only that "[o]nce the community has decided that a particular educational program is important enough to be offered by its public schools, a student's participation in that program [could not] be made to depend upon his or her family's decision whether to pay a fee or buy a toaster," and "[t]he constitutional defect in [imposing] such fees [could] neither be corrected by providing waivers to indigent students, nor justified by pleading financial hardship." (*Id*. at pp. 912, 913.)

[7] In *Committee For Educ. Rights*, the court analyzes the language in section 1 of article X of the Illinois Constitution of 1970, which reads, in pertinent part: " 'A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities. [¶] *The State shall provide for an efficient system of high quality public educational institutions and services*. . . . [¶] The State has the primary responsibility for financing the system of public education. ([Italics] added.)' " (*Committee For Educ. Rights, supra,* 672 N.E.2d at p. 1183.)

12

easily reckoned through formal judicial fact-finding.  In contrast, an open and robust public debate is the lifeblood of the political process in our system of representative democracy.  Solutions to problems of educational quality should emerge from a spirited dialogue between the people of the State and their elected representatives."  (672 N.E.2d at p. 1191; see also *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1213 (*Wells*) [an allegation that "seeks to raise issues of the *quality* of education," and "the academic *results* produced," falls "within the rule that courts will not entertain claims of 'educational malfeasance' "]; *Serrano v. Priest* (1976) 18 Cal.3d 728, 748 ["[q]uality cannot be defined wholly in terms of performance on statewide achievement tests because such tests do not measure all the benefits and detriments that a child may receive from his educational experience"].)

## IV.  Sections 1 and 5 of Article IX Do Not Provide For A Minimum Level of Educational Expenditures

In seeking reinstatement of their complaints, appellants alternatively posit that regardless of their educational adequacy argument, they can demonstrate the Legislature's current allocation of funds for the legislatively-mandated education of public school children fails to comply with article IX.  As a remedy for the purported failure, appellants seek a declaration declaring that the Legislature's current allocation of funds does not provide an adequate education for all public school students, and an order compelling the Legislature to implement an education financing system that complies with the constitutional right to an education *under court supervision*.  We conclude that appellants are not entitled to the requested relief as they cannot show that the constitutional provisions they invoke restrict legislative discretion in allocating funds for the education of public school children.

An overview of California's educational financing scheme, as established by legislation and interpreted by the courts, is helpful to our analysis of appellants' funding claim.  "Under the state Constitution, the Legislature is obligated to provide for a public school system.  (Cal. Const., art. IX, § 5; *Wells*[, *supra*,] 39 Cal.4th [at p.] 1195 [48 Cal.Rptr.3d 108, 141 P.3d 225].)  Seeking to promote local involvement, the Legislature

13

established school districts as political subdivisions and delegated to them that duty. (*Wells*, [*supra*,] at p. 1195; *Butt v. State of California* (1992) 4 Cal.4th 668, 680-681 [15 Cal.Rptr.2d 480, 842 P.2d 1240]; see also [*Hayes, supra*,] 5 Cal.App.4th [at p.] 1523 [7 Cal.Rptr.2d 699].) Historically, school districts were largely funded out of local property taxes. (*Serrano v. Priest* (1971) 5 Cal.3d 584, 592 [96 Cal.Rptr. 601, 487 P.2d 1241] (*Serrano I*); *Serrano v. Priest*[, *supra*,] 18 Cal.3d [at pp.] 737-738 [135 Cal.Rptr. 345, 557 P.2d 929] (*Serrano II*); see *County of Los Angeles v. Sasaki* (1994) 23 Cal.App.4th 1442, 1450 [29 Cal.Rptr.2d 103].) Under the California system of financing as it existed until the 1970's, different school districts could levy taxes and generate vastly different revenues; because of the difference in property values, the same property tax rate would yield widely differing sums in, for example, Beverly Hills and Baldwin Park. (*Serrano I,* at pp. 592-594.)" (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 243 (*Matosantos*).)

In *Serrano I* and *Serrano II*, our Supreme Court invalidated the 1970's system of education financing, "holding that education was a fundamental interest (*Serrano I, supra*, 5 Cal.3d at pp. 608-609; *Serrano II, supra*, 18 Cal.3d at pp. 765-766) and that financing heavily dependent on local property tax bases denied students equal protection (*Serrano I*, at pp. 614-615; *Serrano II,* at pp. 768-769, 776). The *Serrano* decisions threw 'the division of state and local responsibility for educational funding' into ' "a state of flux." ' (*Los Angeles Unified School Dist. v. County of Los Angeles* (2010) 181 Cal.App.4th 414, 419 [104 Cal.Rptr.3d 590].) In their aftermath, a 'Byzantine' system of financing ([*Hayes, supra,* 5 Cal.App.4th at p. 1525]) evolved in which the state became the principal financial backstop for local school districts. Funding equalization was achieved by capping individual districts' abilities to raise revenue and enhancing state contributions to ensure minimum funding levels." (Lockard, *In the Wake of* Williams v. State: *The Past, Present, and Future of Education Finance Litigation in California* (2005) 57 Hastings L.J. 385, 388-398; see generally *Wells*[, *supra,*] 39 Cal.4th at p. 1194 [discussing current funding regime].)" (*Matosantos, supra*, 53 Cal.4th at pp. 243-244.)

Thereafter, in 1978, the voters adopted Proposition 13 (Cal. Const., art. XIII A,

14

added by Prop. 13, as approved by voters, Primary Elec. (June 6, 1978)), which "capped ad valorem real property taxes imposed by all local entities at 1 percent (Cal. Const., art. XIII, § 1, subd. (a)), reducing the amount of revenue available by more than half (Stark, *The Right to Vote on Taxes* (2001) 96 Nw.U.L.Rev. 191, 198).  In place of multiple property taxes imposed by multiple political subdivisions, it substituted a single tax to be collected by counties and thereafter apportioned.  (Cal. Const., art. XIII A, § 1, subd. (a).)" (*Matosantos, supra*, 53 Cal.4th at p. 244.) "Proposition 13 transformed the government financing landscape in at least three ways . . . .  First, by capping local property tax revenue, it greatly enhanced the responsibility the state would bear in funding government services, especially education.  [Citations.]  Second, by failing to specify a method of allocation, Proposition 13 largely transferred control over local government finances from the state's many political subdivisions to the state, converting the property tax from a nominally local tax to a de facto state-administered tax subject to a complex system of intergovernmental grants.  [Citations.]  Third, by imposing a unified, shared property tax, Proposition 13 created a zero-sum game in which political subdivisions (city, counties, special districts, and school districts) would have to compete against each other for their slices of a greatly shrunken pie." (*Matosantos*, *supra*, at pp. 244-245, fn. omitted.)

"In 1988, the voters added another wrinkle with Proposition 98, which established constitutional minimum funding levels for education and required the state to set aside a designated portion of the General Fund for public schools.  (Cal. Const., art. XVI, § 8; see *Los Angeles Unified School Dist. v. County of Los Angeles, supra*, 181 Cal.App.4th at p. 420; [*Hayes,*] *supra*, 5 Cal.App.4th at pp. 1517-1518.)  Two years later, the voters revised and effectively increased the minimum funding requirements for public schools. (Prop. 111, as approved by voters, Primary Elec. (June 5, 1990), amending Cal. Const., art. XVI, § 8; see *County of Sonoma v. Commission on State Mandates* (2000) 84 Cal.App.4th 1264, 1289 [101 Cal.Rptr.2d 784].)" (*Matosantos, supra*, 53 Cal.4th at p. 245**.**)  With this background in mind, we now turn to an analysis of appellants' funding claim.

As previously stated, appellants assert that the California Constitution mandates that the Legislature appropriate funds for education that are sufficiently adequate to provide all public school students with an equal opportunity to meet proficiency standards currently set by the Legislature. In the *Serrano* decisions, our Supreme Court determined that the courts were competent to decide whether or not the Legislature's distribution of state funds for education was consistent with the equal protection of the law provisions of the State constitution. (*Serrano II, supra*, at pp. 768-769, 776; *Serrano I, supra*, 5 Cal. 3d at pp. 614-615.) Appellants argue that the declaratory and injunctive relief they seek is "precisely the type of relief" authorized by our Supreme Court in its *Serrano* decisions. We find no support for appellants' argument in the *Serrano* decisions. To the contrary, our Supreme Court made clear in *Serrano I* that there is no constitutional mandate for the Legislature "to provide funds for each child in the State at some magic level to produce either an adequate-quality educational program or a high-quality educational program." (*Serrano v. Priest* (1977) 20 Cal.3d 25, 36, fn. 6 [describing the decision in *Serrano I*]; see also *Serrano I, supra*, at p. 596 ["article IX, section 5 makes no reference to school financing"].) [8] Appellants eschew that they are seeking a court directive compelling the Legislature to provide for "a magic level" or any specific level of educational funds. "Functionally, however," their funding claim would require this court to impose its "judgment over that of the Legislature in order to determine whether a particular policy benefits public education." (*Woonsocket Sch. Comm. v. Chafee* (R.I. 2014) 89 A.3d 778, 793.) Thus, unlike the *Serrano* decisions on which appellants rely,

---

[8]    Consequently, we reject appellants' reliance on our Supreme Court's general observation in *Serrano I* that "surely the right to an education today means more than access to a classroom." (5 Cal.3d at p. 607.) *Serrano I* neither addressed nor found a constitutional mandate imposing on the Legislature a duty to fund an education of "some quality" that appellants seek to enshrine in articles I and 5 of article IX. "It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court." (*Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal. 4th 1182, 1195-1196.) "General expressions in opinions that go beyond the facts of the case will not necessarily control the outcome in a subsequent suit involving different facts." (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985.)

16

allowing appellants' funding claim to proceed would require the courts to intrude into the Legislature's appropriation powers, which we decline to do.  (See *Grossmont Union High School Dist. v. State Dept. of Education* (2008) 169 Cal.App.4th 869, 889 (*Grossmont*) ["[u]nder the California Constitution, the judiciary has no general authority to compel appropriations or second-guess legislative spending decisions"].)

We conclude our discussion here by "emphasiz[ing] that the Legislature's power over our public school system is plenary, subject only to constitutional restraints. [Citations.]" (*Wilson, supra*, 75 Cal.App.4th at p. 1134.)  Thus, appellants' assertion "that the Legislature is not providing enough funding for [education] is not a basis for a lawsuit." (*Grossmont, supra*, 169 Cal.App.4th at p. 886; see *California School Bds. Assn. v. State of California* (2011) 192 Cal.App.4th 770, 798 ["[t]he formulation of a budget bill, including the items to be placed in the bill, is inherently a discretionary and legislative power," and "[t]he budget determination is 'limited by [the Legislature's] discretion, and beyond the interference of courts' "]; *id*. at p. 799 ["[t]he California Constitution's separation of powers doctrine forbids the judiciary from issuing writs that direct the Legislature to take specific action, including to appropriate funds and pass legislation"].)  Appellants raise "a public policy claim, 'properly resolved . . . in the halls of the Legislature.' " (*Grossmont, supra*, at p. 892.)

## V.    Conclusion

We agree wholeheartedly with appellants that the provision of a quality education for all public school students is an important goal for society as it ensures full participation in our constitutional democracy.  Nonetheless, we must deny their request to reinstate those portions of their complaints' causes of action based on alleged violations of sections 1 and 5 of article IX.  When read singly or together, sections 1 and 5 of article IX evince no constitutional mandate to an education of a particular standard of achievement or impose on the Legislature an affirmative duty to provide for a particular level of education expenditures.  Our decision is consistent with the "rules of constitutional interpretation, which require that constitutional limitations and restrictions on legislative power ' " 'are to be construed strictly, and are not be extended to include

17

matters not covered by the language used.' " ' [Citation.] Under these principles, there is no basis for applying [sections 1 and 5 of article IX] as an equitable remedy to cure the perceived unfairness resulting from political decisions on funding priorities," (*City of San Jose v. State of California* (1996) 45 Cal.App.4th 1802, 1816-1817), or to "delineate or identify any specific outcome standards to be achieved by [the Legislature's] performance of its duty to provide for a system of common schools" (*Bonner, supra,* 907 N.E.2d at p. 521). In the absence of a challenge to any legislative enactment, we conclude sections 1 and 5 of article IX, standing alone, do not allow the courts to dictate to the Legislature, a coequal branch of government, how to best exercise its constitutional powers to encourage education and provide for and support a system of common schools throughout the state.[9] Because sections 1 and 5 of article IX do not impose on the Legislature any duties that can be judicially enforced, there is no reason for a judicial evaluation as to whether there has been a breach of those alleged duties.[10] Even if the matter were remanded for a trial, appellants would not be entitled to the declaratory and injunctive relief requested in their pleadings. "The quandary described in the complaint[s] is lamentable, but the remedy lies squarely with the Legislature, not the judiciary." (*Grossmont, supra*, 169 Cal.App.4th at p. 892.) Accordingly, we affirm the judgments of dismissal in favor of respondents.[11]

---

[9]     We note that appellants do not seek leave to amend their complaints. They ask us only to uphold allegations that the State is violating sections 1 and 5 of article IX, standing alone and untethered to any challenge to legislative enactments.

[10]     And, accordingly, we do not need to articulate a *judicial* standard to be applied by the trial court to determine whether the Legislature is providing an education of "some quality" to all public school children.

[11]     " 'Strictly speaking, a general demurrer is not an appropriate means of testing the merits of the controversy in a declaratory relief action because plaintiff is entitled to a declaration of his rights even if it be adverse.' [Citations.] However, 'where the issue is purely one of law, if the reviewing court agreed with the trial court's resolution of the issue it would be an idle act to reverse the judgment of dismissal for a trial on the merits. In such cases the merits of the legal controversy may be considered on an appeal from a judgment of dismissal following an order sustaining a demurrer without leave to amend and the opinion of the reviewing court will constitute the declaration of the legal rights

18

## DISPOSITION

The judgments of dismissal are affirmed. Defendants and respondents are awarded costs on appeal.

_____
Jenkins, J.

I concur:

_____
Siggins, J.

---

and duties of the parties concerning the matter in controversy.' [Citations.]" (*Herzberg v. County of Plumas* (2005) 133 Cal.App.4th 1, 24.) Because we have resolved appellants' demurrers and motion for judgment on the pleadings, as matters of law, "[t]he object[s] of the declaratory relief actions [are] served by our opinion that" appellants have failed to state causes of actions against respondents based on alleged violations of sections 1 and 5 of article IX, and accordingly, no remand is necessary. (*Teresi v. State of California* (1986) 180 Cal.App.3d 239, 245, fn. 4; see *Savient Pharmaceuticals, Inc. v. Department of Health Services* (2007) 146 Cal.App.4th 1457, 1464.) In light of our determination, we do not need to separately address the parties' other arguments.

SIGGINS, J., Concurring.

I join fully in the majority opinion authored by Justice Jenkins. I am writing separately to address my particular impressions and observations of the nature of the plaintiffs' claim.

There is no question that this case is largely about the adequacy of state financial support for California public schools. The defendants are the State of California, the Governor, State Controller and the Director of the State Department of Finance. The Superintendent of Public Instruction and the State Board of Education are not parties. The complaints seek declaratory and injunctive relief to require the state to "set apart the revenues" to "provide and support an education finance system" that will provide students "the opportunity to obtain a meaningful education and to learn the academic content standards."

The plaintiffs allege that our state's constitutionally recognized right to education brings with it an obligation of the state to fund education at a qualitative level—an obligation that arises organically and by implication from a reading of article IX sections 1 and 5 of our state constitution together. They say, "Taken as a whole, the language and history of article IX make clear that the fundamental right to an education must have some qualitative meaning, and it is the duty of the State to keep up and support an educational system that provides all California school children that fundamental right." This implicit constitutional obligation is yet inchoate and undefined, and no court of our state has yet recognized it.

As much as I can appreciate the plaintiffs' frustration and dissatisfaction with the overall adequacy of California's public schools, and recognize our Legislature's challenges in adequately funding schools to meet the standards it sets, I cannot agree that article IX provides a right to command the state to fund schools at some qualitative level. I so conclude for three principal reasons.

Our state constitution contains provisions that, the plaintiffs acknowledge, explicitly set a minimum level of funding to public schools. But it also contains provisions that set a maximum. Proposition 98 passed by the voters in 1988 and

1

Proposition 111 passed in 1990 established a minimum level of funding commonly known as the minimum funding guarantee, but also established a limit of excess revenues that can go to the schools. (Cal. Const., art. XVI, §§ 8, 8.5.) Moreover, as recently as 2014, voters approved a measure placed on the ballot by the Legislature to add section 21 to article XVI of the state constitution to create a state reserve for schools and community colleges and thereby lessen the impact of any economic downturn on the amount of money available to the schools under constitutional formulas. For me, these express provisions conflict with the plaintiffs' argument that an implicit constitutional right to educational adequacy mandates some other minimum specific level of state support to the schools.

Second, I have no quibble with the plaintiffs' position that the state must afford students the "opportunity to obtain a meaningful education and to learn the academic content standards." For me, assessing whether that obligation has been fulfilled begins and ends with whether our educational system enables sufficient numbers of students to meet the standards articulated in state statutes. The Superintendent of Public Instruction is required by law to develop an Academic Performance Index that measures the performance of school districts, schools and pupils. This index is required to take into account results of statewide achievement tests administered to students in grades 2 through 11. (Ed. Code, § 52052, subd. (a)(1) & (a)(4)(A).) In 2013, this system of assessment was modified to utilize a new testing method. (Ed. Code, § 52052 as amended by Stats. 2013, ch. 489 (A.B. 484).) The new testing and assessment scheme reflects the "intent of the Legislature that the state's system of public school accountability be more closely aligned with both the public's expectations for public education and the workforce needs of the state's economy. It is therefore necessary that the accountability system evolve beyond its narrow focus on pupil test scores to encompass other valuable information about school performance, including, but not

2

limited to, pupil preparedness for college and career, as well as the high school graduation rates already required by law." (Ed. Code, § 52052, subd. (a)(4)(H).)[1]

The plaintiffs say the academic standards articulated in our Education Code inform the constitutional right to a quality education but do not prescribe it. I disagree. It seems to me that our state's obligation to ensure that most students perform at adequate levels is prescribed in the statutory academic standards. In the event that large numbers of students cannot meet expected levels of achievement, an action should arise under the statutes to improve the performance of our public schools without resort to the general language of article IX as authority. Such a statutory basis for an action would also be in accord with the general principle of judicial restraint that courts should not decide constitutional questions where other grounds are available and dispositive of the issues. (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230.) The plaintiffs did not allege any statutory theory for a cause of action in this case, so the parameters of such a claim must await another day.

Finally, also in 2013, our Legislature modified our school funding formula to better address needs based upon differences between school district populations and appropriated an additional $2 billion to the public schools. (Stats. 2013, ch. 47.) Whatever this may mean for the future, one thing seems clear to me. State policymakers are working on the problem, and an action that primarily seeks to increase the amount of state funds provided to the schools may not be the prescription for success. Rather, the balance between more resources and operational and organizational change in the schools may need to be differently struck. Recognition of some duty to support and fund the schools at some particular level may, in the end, do little to advance the cause of educational adequacy.

_____
Siggins, J.

_____

[1] A general description of the California Assessment of Student Performance and Progress System along with reports of the most recent scores can be found on the Department of Education website at: <http://www.cde.ca.gov/ta/tg/ca/> (as of April 20, 2016).

POLLAK, J., Dissenting.

Of the numerous issues presented by this difficult case, two are fundamental: Do sections 1 and 5 of article IX of the California Constitution compel the state to maintain an elementary school system for grades kindergarten through grade 12 (K-12) that meets some minimal qualitative standard and, if so, is the claim that the present school system fails to meet that standard justiciable—that is, may the courts entertain that claim and seek to compel the appropriate state agencies to correct the deficiency? Neither question is susceptible to a facile response. The same issues have been considered at length under similar provisions of other state constitutions by the highest courts of numerous states— with different outcomes. Most state supreme courts addressing the question have read their state constitution implicitly to mandate a minimum qualitative educational system which they have struggled to enforce,[1] while a lesser number have either held the mandate lacking or the courts unsuited to articulate and enforce any such qualitative standard.[2] Although the parties here attempt to distinguish many of these out-of-state cases based on differences in the terminology of the respective state's constitutional provisions, as a general proposition these differences in phraseology are insignificant.

---

[1] E.g., *Conn. Coalition for Justice in Educ. Funding, Inc. v. Rell* (2010) 295 Conn. 240 [990 A.2d 206, 210-256] (plur. opn. of Norcott, J.); *Gannon v. State* (2014) 298 Kan. 1107 [319 P.3d 1196, 1216-1231]; *Abbeville County Sch. Dist. v. State* (2014) 410 S.C. 619 [767 S.E.2d 157, 163-180]; *McCleary* v. *State* (2012) 173 Wash.2d 477 [269 P.3d 227, 246-262]; *Neeley v. West Orange-Cove Consol. Indep. Sch. Dist.* (2005) 49 Tex. Sup. Ct. J. 119 [176 S.W.3d 746, 776-800]; *Campaign for Fiscal Equity, Inc. v. State* (1995) 86 N.Y.2d 307 [655 N.E.2d 661, 664-671]; *McDuffy v. Secretary of the Executive Office of Educ.* (1993) 415 Mass. 545 [615 N.E.2d 516, 519-556]; *Rose v. Council for Better Educ.* (Ky. 1989) 790 S.W.2d 186, 205-214; *Robinson v. Cahill* (1973) 62 N.J. 473, 515-521 [303 A.2d 273, 287-298]; see generally, Gordon, *California Constitutional Law: The Right to an Adequate Education* (2016) 67 Hastings L.J. 323, 351 (hereafter Gordon) ["a review of other states' decisions reveals that there is a movement in favor of finding a substantive, qualitative right to education under state constitutions"].

[2] E.g., *Woonsocket School Com. v. Chafee* (R.I. 2014) 89 A.3d 778, 787-792; *Bonner ex rel. Bonner v. Daniels* (Ind. 2009) 907 N.E.2d 516, 520-522; *Com. for Educ. Rights v. Edgar* (1996) 174 Ill.2d 1 [672 N.E.2d 1178, 1183-1193]; see Gordon, *supra,* 67 Hastings L.J. at p. 352 ["In the minority of states that have declined to find a right to adequacy, their supreme courts have never found education to be a fundamental right."].

All of the constitutions, like the California Constitution, in substance require the state to support a system of public or common schools. Although some state constitutional provisions refer to the maintenance of "efficient" or "thorough and efficient" schools or school systems, or like terms, none explicitly indicate a particular level of achievement that is required.[3] The different outcomes result less from differences in the wording of the respective constitutions than from different perceptions of the role properly played by the courts in overseeing compliance with the state's basic charter. I respectfully dissent from my colleagues' decision to align California with those few state courts that have declined to accept the responsibility to enforce the right of every child to an adequate education.

1.      *Do sections 1 and 5 of article IX of the California Constitution impose a minimum qualitative standard?*

There is, of course, no question but that the California Constitution mandates a public school system, which has been held to apply to grades K-12. (*Levi v. O'Connell* (2006) 144 Cal.App.4th 700, 708.) Section 5 of article IX of the California Constitution requires the Legislature to "*provide*" for a system of common schools that "*shall be kept up and supported*" for at least six months of the year. While this section says nothing explicitly about the necessary quality of such schools, its meaning is informed by section 1 of article IX. Section 1 begins with the recognition that "[a] general diffusion of knowledge and intelligence" is essential to the preservation of the rights and liberties of the people, and requires the Legislature to "encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." Presumably the system of common schools prescribed by section 5 must encourage the promotion of such improvement.

---

[3] The opinion in *Pauley v. Kelly* (1979) 162 W.Va. 672 [255 S.E.2d 859, 884-886] contains an Appendix I that sets out in one place the clauses in each state constitution that provide for public school systems. The opinion in *Connecticut Coalition for Justice in Education Funding, Inc. v. Rell, supra,* 990 A.2d at pages 244-250 contains an extended discussion of "Sister State Decisions" addressing the interpretation of these provisions and citations to additional cases on point not cited in this opinion.

In holding that education is a fundamental interest under our state Constitution's equal protection clause, in the landmark decision *Serrano v. Priest* (1971) 5 Cal.3d 584, the Supreme Court began "by examining the indispensable role which education plays in the modern industrial state. This role, we believe, has two significant aspects: first, education is a major determinant of an individual's chances for economic and social success in our competitive society; second, education is a unique influence in a child's development as a citizen and his participation in political and community life. '[T]he pivotal position of education to success in American society and its essential role in opening up to the individual the central experiences of our culture lend it an importance that is undeniable.' [Citation.] Thus, education is the lifeline of both the individual and society." (*Id.* at p. 605.) The *Serrano* court went on to quote from the historic *Brown v. Board of Education* decision ((1954) 347 U.S. 483, 493), that " '[i]n these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.' " (5 Cal.3d at p. 606.)

As the lead opinion recognizes, and I repeat here two paragraphs of the opinion, "there can be no doubt that the fundamental right to a public school education is firmly rooted in California law as it "has historically been accorded an ascendant position in this state. Indeed, at the very start, article IX of our 1849 Constitution created the office of Superintendent of Public Instruction; required the Legislature to encourage by all suitable means the promotion of intellectual, scientific, moral and agricultural improvement; required the Legislature to establish a system of common schools; and established a fund for the support of the common schools. (See Stats. 1849, p. 32.) . . . Section 1 of article IX of the Constitution now provides, as it has since 1879: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." Section 5 of article IX presently mandates, as it has since 1879: "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been

3

established." ' (*California Teachers Assn. v. Hayes* (1992) 5 Cal.App.4th 1513, 1522 . . . .) [¶] 'The early case of *Ward v. Flood* (1874) 48 Cal. 36 [(*Ward*)] considered the provisions of the Constitution of 1849 relative to educational affairs which, in all material respects, [are] similar to the present Constitution. The Supreme Court said: "The opportunity of instruction at public schools is afforded the youth of the state by the statute of the state, enacted in obedience to the special command of the constitution of the state, directing that the legislature shall provide for a system of common schools, by which a school shall be kept up and supported in such district . . . , etc. ([A]rt. XIX, [former] [§] 3). The advantage or benefit thereby vouchsafed to each child, of attending a public school is, therefore, one derived and secured to it under the highest sanction of positive law. *It is therefore, a right — a legal right —* as distinctively so as the vested right in property owned is a legal right, and as such it is protected, and entitled to be protected by all the guarantees by which other legal rights are protected and secured to the possessor.' ([*Ward*, *supra*,] 48 Cal. at p. 50, italics added. . . .)" (*Slayton v. Pomona Unified School Dist.* (1984) 161 Cal.App.3d 538, 548-549, fn. omitted.)" (Lead opn., *ante*, pp. 6-7.)

Thus, our state's jurisprudence makes clear that our children have a right to an education. And, as Chief Justice Cantil-Sakauye wrote when sitting on the Court of Appeal, "naturally" the school system mandated by the Constitution "should provide a high quality education for all the students of our state." (*Levi v. O'Connell, supra,* 144 Cal.App.4th at p. 708.) In that case, involving the demands of a highly gifted teenager, the court held that article IX section 5 does not confer "a right to a free college education." (*Levi*, p. 710.) But neither that nor any other decision takes issue with our Supreme Court's observation in *Serrano v. Priest, supra,* 5 Cal.3d at page 607, that "surely the right to an education today means more than access to a classroom."

As the majority of state courts addressing this issue has recognized, if the constitutional provision is to have meaning, it must imply that the system of common schools must provide some minimum qualitative level of education. Such a reading of article IX is fully consistent with, if not compelled by, the importance that our Supreme

4

Court historically has placed on the role of education and the recognition that it is a fundamental right of all the state's children. Certainly there are extremes that all would agree fail to meet the constitutional standard—such as a curriculum that did not include reading or arithmetic, or a schedule of only one day or one hour per week. As stated by the Texas Supreme Court in a case much like the one before us, "no one would dispute that a public education system limited to teaching first-grade reading would be inadequate." (*Neeley v. West Orange-Cove Consol. Indep. Sch. Dist., supra,* 176 S.W.3d at p. 778.) Indeed, in *Butt v. State of California* (1992) 4 Cal.4th 668, in determining whether the truncation of the school term by a school district violates the state Constitution's guaranty of educational equality, our Supreme Court pointed to the need to consider "the actual quality of the district's program, viewed as a whole." (*Id.* at pp. 686-687; see also, e.g., *Conn. Coalition for Justice in Educ. Funding, Inc. v. Rell, supra,* 990 A.2d at pp. 249-250 ["our research has revealed that those state courts that have reached the merits of the issue overwhelmingly have held that there is a floor with respect to the adequacy of the education provided pursuant to their states' education clauses; that education must be in some way 'minimally adequate' or 'soundly basic' "]; *Gannon v. State of Kansas, supra,* 319 P.3d at p. 1228] [" '*There is a point where the legislature's funding of education may be so low* that . . . it would be impossible to find that the legislature has made "suitable provision for finance of the educational interests of the state." ' "].)

The seemingly obvious point, with which my colleagues disagree, that the constitutional mandate to provide a public school system implies the need to maintain public schools at some minimum level of competence, is brought home by comparison to the right to counsel. Although both the federal and state Constitutions say merely that there is a right to "the assistance of counsel" (U.S. Const., Amend. VI; Cal. Const., art. I, § 15), there is no doubt that this right implies that the assistance must be effective or adequate assistance. As noted by one commentator, "[t]he parallels between the right to adequate counsel and a right to adequate education have not gone unnoticed by the California Supreme Court; the court compared the two in its first *Serrano* decision, and

5

even noted that 'from a larger perspective, education may have far greater social significance' than the right to a fair trial." (Gordon, *supra*, 67 Hastings L.J. at pp. 349-350; see *Serrano v. Priest, supra,* 5 Cal.3d at p. 607.)

Recognizing that the public schools must operate at some minimum level of proficiency admittedly does not define the quality of the system that must be maintained. Certainly the Constitution does not mandate particular curriculum or instructional methods, specifics that are within the discretion of the Legislature to determine. "There can thus be no doubt that our Constitution vests the Legislature with sweeping and comprehensive powers in relation to our public schools (*Hall v. City of Taft* [(1956)] 47 Cal.2d [177,] 179), including broad discretion to determine the types of programs and services which further the purposes of education ([*Hayes,*] *supra,* 5 Cal.App.4th at p. 1528)." (*Wilson v. State Bd. of Educ*. (1999) 75 Cal.App.4th 1125, 1134-1135.) "[T]he curriculum and courses of study are not constitutionally prescribed [but] . . . are *details* left to the Legislature's discretion [and] . . . do not constitute part of the system but are merely a function of it. (*California Teachers Assn. v. Board of Trustees* [(1978)] 82 Cal.App.3d [249,] 255.) The same could be said for such functions as educational focus, teaching methods, school operations, furnishing of textbooks and the like." (*Wilson*, *supra*, at p. 1135.)

Yet, the specifics of the education system prescribed by the Legislature do not necessarily create a system that provides students with a minimally acceptable basic education. The complaints before us forcefully allege that the current system does not do so. Plaintiffs allege that although "the state has established a comprehensive education program that defines specific academic knowledge, skills, and abilities that all public schools are expected to teach and all students are expected to learn . . . , [t]here is . . . one glaring omission in the state's required educational 'system': The state makes absolutely no attempt to align funding policies and mechanisms with the educational program it has put in place, to determine the actual cost of the educational program, or to provide districts with the financial resources to provide the programs and services it has prescribed. Nor does the state's funding scheme take into account the learning needs of

6

certain populations of students, including English Learners and economically disadvantaged children, to ensure that all children receive an opportunity to achieve the state's educational goals and thus have an opportunity to participate in civic life and become productive participants in the economy. Instead, the state bases funding for its education program on formulas that were cobbled together decades ago for a very different educational program and very different needs." Plaintiffs quote the 2007 report of the Governor's Committee on Education Excellence, " 'California's current K-12 education finance system is the most complex in the nation but yields little benefits. Core funding is based on anachronistic formulas, neither tied to the needs of individual students nor to intended academic outcomes.' " The same report characterizes the educational system as "fundamentally flawed. It is not close to helping each student become proficient in mastering the state's clear curricular standards, and wide disparities persist between rich and poor, between students of color and others, and between native English Learners and native English speakers."

Under the current system and the minimum funding guarantee of Proposition 98[4] —which plaintiffs allege "has become an artificial cap on education spending whose formulas are routinely manipulated by the state for further reductions or delays in funding"—per pupil spending in California in 2008-2009, adjusted for regional cost differences allegedly "was $2,856 less per pupil than the national average, or an abysmal 47th in the country." In 2007-2008, according to the allegations in one complaint, "California ranked at or near the bottom in the nation in staffing ratios: 49th in total school staff; 47th in principals and assistant principals; 49th in guidance counselors; 50th in librarians; and 49th in access to computers. California educates over 1.7 million students more than Texas, but does so with 16,700 fewer teachers."[5] Besides insufficient

---

[4] California Constitution, article XVI, section 8(b).

[5] According to the allegations in another of the complaints, California ranks "50th in total school staff with 70 per 1,000 students, compared to a national average of 124.7 total school staff per 1,000 students" and "49th out of 51 in teachers, with California schools operating with 75% of the national average of teachers to students."

7

and undertrained staff, plaintiffs allege that the state's public schools suffer from inadequate instructional programs, insufficient materials, equipment and facilities, inadequate data systems and an inadequate system for ensuring uniform teacher quality.

Consequently, the complaints allege: "California students are directly harmed by the state's failure to meet its constitutional obligation to support its system of public schools. In 2008-09, only 50% of California's students were proficient in English-Language Arts; only 37% of African-American students, 37% of Hispanic students. 36% of economically disadvantaged students, and 20% of English Learners reached this level. Only 46% of California's students were proficient in Mathematics; this percentage dropped to 30% for African-American students, 36% for Hispanic students, 37% for economically disadvantaged students, and 32% for English Learners. By eleventh grade, students in these groups had fallen even farther—in English language Arts, only 25% of African-American students, 26% of Hispanic students and economically disadvantaged students, and 5% of English Learners reached proficiency. Even for California students who are not economically disadvantaged, California still ranks tied for 43rd in fourth grade reading and tied for 41st in eighth grade math. [¶] These dismal statistics reflect only the students who remain in school through eleventh grade. . . . Fewer than 70% of California students graduate from high school. The graduation rates are even lower for African-American and Hispanic students, whose graduation rates are both less than 60%. Less than half of African-American males graduate from high school."

The lengthy complaints and extensive briefing, filled with references to a multitude of official reports and academic studies and papers, provide considerably more specifics, criticisms, and proposals than would be profitable to set out at this point. Among other reasons why further specificity here would be pointless is that in the several years that these cases have been pending, there have been legislative and funding changes that may affect the present accuracy of plaintiffs' allegations. Should these actions proceed to trial, the focus would of course be on current conditions to the extent that relevant data is available. Nonetheless, despite changes—hopefully improvements—that have occurred more recently, the fundamental issues raised by the complaints remain:

Does the California Constitution imply minimum qualitative requirements for the state's educational system, and is it for the courts to determine whether those requirements are satisfied and to enforce them if they are not?

The contention that the current system fails to satisfy a constitutional mandate necessarily supposes a standard by which to define a minimally acceptable quality of education. The inherent difficulty of articulating such a standard, and the absence of such an articulation within the language of the state constitutions, in large part underlies the refusal of those state supreme courts that have declined to interpret their constitution to imply such a standard. However, decisions from many other states demonstrate that courts are capable of articulating such a standard, albeit a standard that is general and requires intensive factual analysis to apply.

In *Campaign for Fiscal Equity, Inc. v. State, supra,* 655 N.E.2d 661 (*CFE I*), for example, the New York Court of Appeal, with only the pleadings before it, did "not attempt to definitively specify what the constitutional concept and mandate of a sound basic education entails" but "articulate[d] a template reflecting [its] judgment of what the trier of fact must consider in determining whether defendants have met their constitutional obligation" (*id*. at pp. 666-667). The court held that a sound basic education within the meaning of the New York Constitution "should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury." (*Id*. at p. 666.) Further, "Children are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas." (*Ibid*.) Following a trial, in *Campaign for Fiscal Equity, Inc. v. State of New York* (2003) 100 N.Y.2d 893 [801 N.E.2d 326] (*CFE II*), the court defined "sound basic education" more exactly, as the "opportunity for a meaningful

9

high school education, one which prepares [children] to function productively as civic participants." (*Id.* at p. 332; see *Campaign for Fiscal Equity, Inc. v. State of New York* (2006) 8 N.Y.3d 14 [861 N.E.2d 50, 53] (*CFE III*).) "To determine whether New York City schools in fact deliver the opportunity for a sound basic education, the trial court took evidence on the 'inputs' children receive—teaching, facilities and instrumentalities of learning—and their resulting 'outputs,' such as test results and graduation and dropout rates." (*CFE II, supra*, at p. 332.) Ultimately, based on the evidence presented at trial, the high court upheld the finding that there was a causal link between the state's funding system and the failure of New York City's schools to provide children "the constitutionally mandated opportunity for a sound basic education." (*CFE II, supra*, at p. 340; *CFE III, supra*, at p. 52.)

A somewhat similar standard was articulated by the Supreme Court of Kentucky. (*Rose v. Council for Better Educ., supra,* 790 S.W.2d 186.) Interpreting its state constitutional provision requiring the legislature to "provide for an efficient system of common schools" (KY Const., § 183), the court held that "[t]he essential, and minimal, characteristics of an 'efficient' system of common schools" include providing all children with an adequate education, and that an adequate education is one which has as its goal the development of 'at least the seven following capabilities:  (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable students to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient level of academic or vocational skills to enable public school students to compete favorably with

their counterparts in surrounding states, in academics or in the job market.' " (790 S.W.2d at pp. 212-213.)

The Supreme Judicial Court of Massachusetts considered "[t]he guidelines set forth by the Supreme Court of Kentucky [to] fairly reflect [its] view" of the applicable guidelines under the Massachusetts Constitution. (*McDuffy v, Secretary of the Executive Office of Education, supra,* 615 N.E.2d at pp. 554-555.) And the Supreme Court of Kansas "expressly adopted the *Rose* court's articulated standards like other supreme courts," deeming them "minimal standards" that " 'should be considered as minimum goals in providing an adequate education.' " (*Gannon v. State of Kansa, supra*, 319 P.3d at p. 1236.)

The Supreme Court of Connecticut concluded, "consistent with the conclusions of other state courts that have considered similar constitutional guarantees, that [the Connecticut constitutional provision that "there shall always be free public elementary and secondary schools in the state"] embodies a substantive component requiring that the public schools provide the students with an education suitable to give them the opportunity to be responsible citizens able to participate fully in democratic institutions such as jury service and voting, and to prepare them to progress to institutions of higher education, or to attain productive employment and otherwise to contribute to the state's economy." (*Conn. Coalition for Justice in Educ. Funding, Inc. v. Rell, supra*, 990 A.2d at p. 227.)

Other state supreme courts have defined the contours of an acceptable system of public education in their own way, but have similarly concluded that the constitutional requirement of maintaining a system of public schools implies the duty to support the system at some qualitative level. (E.g., *McCleary* v. *State*, *supra*, 269 P.3d at pp. 231, 236, 250 [education required under state constitution "consists of the *opportunity* to obtain the knowledge and skills" described in a prior opinion,[6] in four learning goals

---

[6] In *Seattle School Dist. No. 1 of King County v. State* (1978) 90 Wash.2d 476 [585 P.2d 71, 94-95], the Washington Supreme Court held that the state had a constitutional duty to provide an education that " 'goes beyond mere reading writing and arithmetic. It also

specified in a subsequently adopted and amended Basic Education Act and in academic learning requirements "in nine separate content areas, including reading, math, science, writing, communication, social studies, the arts, health and fitness, and educational technology"]; *Pauley v. Kelly* (1979) 162 W.Va. 672 [255 S.E.2d 859, 877-878] ["a thorough and efficient system of schools . . . develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically. [¶] Legally recognized elements in this definition are development in every child to his or her capacity of (1) literacy; (2) ability to add, subtract, multiply and divide numbers; (3) knowledge of government to the extent that the child will be equipped as a citizen to make informed choices among persons and issues that affect his own governance; (4) self-knowledge and knowledge of his or her total environment to allow the child to intelligently choose life work to know his or her options; (5) work-training and advanced academic training as the child may intelligently choose; (6) recreational pursuits; (7) interests in all creative arts, such as music, theatre, literature, and the visual arts; (8) social ethics, both behavioral and abstract, to facilitate compatibility with others in this society.  [¶] Implicit are supportive services:  (1) good physical facilities, instructional materials and personnel; (2) careful state and local supervision to prevent waste and to monitor pupil, teacher and administrative competency.  [¶] . . . "[T]he Thorough and Efficient Clause requires the development of certain high quality educational standards, and . . . it is in part by these quality standards that the existing educational system must be tested.']; see also, e.g., *Robinson v. Cahill, supra,* 303 A.2d

---

embraces educational opportunities needed in the contemporary setting to equip our children for their role as citizens and as potential competitors in today's market as well as in the market place of ideas.  Education plays a critical role in a free society.  It must prepare our children to participate intelligently and effectively in our open political system to ensure that system's survival.  It must prepare them to exercise their First Amendment freedoms both as to sources and receivers of information; and, it must prepare them to be able to inquire, to study, to evaluate and to gain maturity and understanding.' "  (See *McCleary v. State*, *supra*, 269 P.3d at p. 246.)

at p. 295 ["The Constitution's guarantee must be understood to embrace that educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market."]; *Campbell County School Dist. v. State* (Wyo. 1995) 907 P.2d 1238, 1259 [constitution mandates "an education system of a character which provides . . . students with a uniform opportunity to become equipped for their future roles as citizens, participants in the political system, and competitors both economically and intellectually."].)

In *McDuffy v. Secretary of the Executive Office of Education, supra,* 615 N.E.2d at page 517, the Supreme Judicial Court of Massachusetts considered these issues in the context of the Commonwealth's constitutional provision requiring the Commonwealth to "cherish" the public schools. The court reviewed the history of public education in Massachusetts and noted the importance attached to such education. The court concluded that "[w]hat emerges from this review is that the words are not merely aspirational or hortatory, but obligatory. What emerges also is that the Commonwealth has a duty to provide an education for *all* its children, rich and poor, in every city and town of the Commonwealth at the public school level." (*Id*. at p. 548.) The record in that case "show[ed] clearly that, while the present statutory and financial schemes purport to provide equal educational opportunity in the public schools for every child, rich or poor, the reality is that children in the less affluent communities (or in the less affluent parts of them) are not receiving their constitutional entitlement of education as intended and mandated by the framers of the Constitution." (*Id.* at p. 552.) The court concluded "that the Commonwealth has failed to meet its constitutional obligation." (*Ibid.*)

In *Abbeville County School District v. State of South Carolina, supra*, 767 S.E.2d at page 167, the Supreme Court of South Carolina "acknowledge[d] that the Defendants enacted a robust education scheme designed to address the critical aspects of public education," but observed that "student performance in the Plaintiff Districts demonstrates an apparent disconnect between intentions and performance." According to the court, "The measurable inputs and outputs show that the Defendants have failed to provide students in the Plaintiff Districts the requisite constitutional opportunity. Inadequate

transportation fails to convey children to school or home in a manner conducive to even minimal academic achievement. Students in the Plaintiff Districts receive instruction in many cases from a corps of unprepared teachers. Students in these districts are grouped by economic class into what amounts to no more than educational ghettos, rated by the Department of Education's guidelines as substandard. Large percentages of the students in the Plaintiff Districts—over half in some instances—are unable to meet minimal benchmarks on standardized tests, but are nonetheless pushed through the system to 'graduate.' " (*Id.* at p. 175.) The court held that "South Carolina's educational funding scheme is a fractured formula denying students in the Plaintiff Districts the constitutionally required opportunity [for a basic education]." (*Id.* at p. 173.)

As have the courts of these many states and others, I too conclude that the provisions of our state Constitution requiring the state to support a system of common schools is not without substance, and that the Constitution requires a system that provides students with a meaningful basic education in reality as well as on paper. As demonstrated by the experience in those states in which their Constitution has been interpreted to mandate an educational system meeting a qualitative standard, a standard such as those articulated in the opinions quoted above, though general, permits meaningful evaluation of a school system by educational professionals and experts. "These standards import a wide spectrum of considerations and are admittedly imprecise, but they are not without content. . . . The constitutional standards provide an appropriate basis for judicial review and determination." (*Neeley v. West Orange-Cove Consolidated Independent School Dist., supra,* 176 S.W.3d at pp. 778-779.) As noted by the Connecticut Supreme Court, its "explication of a constitutionally adequate education" (quoted above) was "crafted in broad terms." (*Conn. Coalition for Justice in Educ. Funding, Inc. v. Rell, supra*, 990 A.2d at p. 254.) But, the court points out, this breadth reflects not only the "recognition of the political branches' constitutional responsibilities, and indeed, greater expertise, with respect to the implementation of specific educational policies" and that "the specific educational inputs or instrumentalities suitable to achieve this minimum level of education may well change over time," but that "like any other

14

principle of constitutional law, this broad standard likely will be refined and developed further as it is applied to the facts eventually to be found at trial in this case." (*Id*. at pp. 254-255.) Using such a standard, the courts can determine whether the existing system of funding and governing California's public schools complies with the constitutional mandate.

2.      *Is the claim that the public school system fails to comply with the constitutional standard justiciable?*

Defendants here make the same contention that other states have made in most of the cases cited above. As in the South Carolina case, they argue that "the term 'minimally adequate education" is purposely ambiguous, objectively unknowable, and unworkable in a judicial setting,' and that determining whether the Defendants are meeting their constitutional duty presents a non-justiciable political question." (*Abbeville County Sch. Dist. v. State, supra*, 767 S.E.2d at p. 163.) My two colleagues essentially adopt this view but, like the Supreme Court of South Carolina, I respectfully disagree. As the court there stated, "Courts may experience difficulty in determining the precise parameters of constitutionally acceptable behavior; however, this imprecision does not necessarily signify that courts cannot determine when a party's actions, or the results of those actions, fall outside the boundaries of such constitutional parameters. . . . [¶] [A]s Chief Justice John Marshall famously stated, '[I]t is emphatically the province and duty of the judicial department to say what the law is.' " (*Ibid.*, quoting *Marbury v. Madison* (1803) 5 U.S. 137, 138.)

The justiciability of a claim that the state is not providing students with a basic education required by the state constitution has been exhaustively analyzed in the opinions of numerous other state supreme courts. As did the Kansas Supreme Court, many have focused on the "six characteristics or elements one or more of which must exist to give rise to a political question" that is nonjusticiable set out in *Baker v. Carr*

15

(1962) 369 U.S. 186, 217. (*Gannon v. State, supra,* 319 P.3d at pp. 1218-1231.)[7] As the Kansas court concluded, "Most state supreme courts have rejected the nonjusticiability argument—which necessarily include those courts that have expressly rejected the contention that no judicially manageable standards were contained in the education articles of their own constitutions." (*Id.* at p. 1226) That court observed that a majority of state courts, including the Texas Supreme Court, have held that " 'the separation of powers does not preclude the judiciary from determining whether the legislature has met its constitutional obligations to the people to provide for public education.' " (*Id.* at p. 1230, quoting *Neeley v. West Orange-Cove Consolidated Independent School Dist., supra,* 176 S.W.3d at pp. 780-781.) As many other courts have concluded, while the courts must " 'defer to the legislature in matters of policymaking', . . . 'it is the province of the judicial branch to define, and safeguard, rights provided by the [state] Constitution, and order redress for violation of them.' " (*CFE III, supra,* 861 N.E.2d at p. 58; *Leandro v. State* (1997) 346 N.C. 336 [488 S.E.2d 249, 253-254] ["When a government action is challenged as unconstitutional, the courts have a duty to determine whether that action exceeds constitutional limits . . . Therefore, it is the duty of this Court to address [plaintiffs'] constitutional challenge to the state's public education system"]; *De Rolph v. State* (1997) 78 Ohio St.3d 193 [677 N.E.2d 733, 737] ["We will not dodge our responsibility by asserting that this case involves a nonjusticiable political question. To do so is unthinkable. We refuse to undermine our role as judicial arbiters and to pass our responsibilities onto the lap of the [legislature]."].)

---

[7] According to *Baker v. Carr, supra,* 369 U.S. at page 217, *"*Prominent on the surface of any case held to involve a political question is found a [1] textually demonstrable constitutional commitment of the issue to a coordinate political department [legislature]; [2] or a lack of a judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

16

To a large extent, defendants' argument and the opinions of my two colleagues rest on the premise that plaintiffs are seeking to compel the California Legislature to appropriate additional funds for K-12 education, which is beyond the constitutional province of the judiciary. While plaintiffs' complaints surely indicate that additional funding is required to bring the public schools up to minimal constitutional quality, there are several reasons for which this limitation on judicial authority and respect for the role of the legislative and executive branches of government do not compel the dismissal of the action. Initially, the complaints address more than the level of present funding. Plaintiffs do not allege simply that the amount of funds appropriated to the schools is insufficient, but that the system by which funds are allocated among schools and school districts is significantly responsible for the inadequacies in the educational system. "[M]oney is only one of a number of elements that must be studied in giving definition and content to the constitutional promise of a thorough and efficient education." (*Robinson v. Cahill, supra,* 355 A.2d at p. 132.) An observation of the Texas Supreme Court may well apply here: following trial, the court there was convinced "that defects in the structure of the public school finance system expose the system to constitutional challenge. Pouring more money into the system may forestall those challenges, but only for a time. They will repeat until the system is overhauled." (*Neeley v. West Orange-Cove Consolidated Independent School Dist., supra,* 176 S.W.3d at p. 754, fn. omitted.) Plaintiffs here point, for example, to the reliance on average daily attendance to determine the amount of base funding each school receives, rather than on the educational needs of each school's student population. At the same time (and perhaps somewhat inconsistently) plaintiffs allege that approximately one-third of educational funds are distributed in the form of categorical grants that impose unduly restrictive conditions and reduce available teaching hours by requiring excessive paperwork and administrative chores. The current funding system, they allege, provides insufficient flexibility to the individual schools and school districts to fashion their curriculum and programs to meet the particular educational needs of the students in their school or school district. Plaintiffs allege that the present system incorporates inadequate teacher training,

17

and some plaintiffs also attribute deficiencies to the methods of teacher evaluation, promotion and discipline.[8] Thus, even if one assumes that full correction of the alleged deficiencies in the educational system cannot be achieved without additional funding, it does not follow that causative defects cannot be identified in judicial proceedings and steps ordered to correct them without overstepping the proper limits of judicial authority.

Furthermore, to the extent that more funds are necessary to provide all students with the basic education mandated by the Constitution, the court's inability to compel the Legislature to appropriate those funds is no reason for the court to refrain from exercising its proper authority to determine whether the state is complying with the constitutional mandate. We need not presume that the Legislature will fail to respond appropriately if the court should ultimately determine that the Constitution is being violated by the lack of sufficient funding. Indeed, our Supreme Court has previously expressed its confidence that "the Legislature, aided by what we have said today . . . will be able to devise a public school financing system which achieves constitutional conformity." (*Serrano v. Priest* (1976) 18 Cal.3d 728, 775, fn. 54.) Many other courts, while recognizing the need for deference to the role of the Legislature, have echoed this view. (E.g., *Ex Parte James* (Ala. 1997) 713 So.2d 869, 882 ["[T]he judiciary should not presume *at the outset* of litigation of this nature that legislative and executive officials will be derelict in their duties. Indeed, it must assume the contrary."].) Moreover, as the experience in other states confirms, various forms of relief are available short of ordering the Legislature to appropriate funds. Courts have required plans to be developed to address and correct adjudicated deficiencies. The intensive examination of the system that trial of plaintiffs' allegations would necessarily entail may be expected to yield other specific forms of

---

[8] In *Vergara v. State of California* (2016) __ Cal.App.4th __ [2016 Cal.App.Lexis 285] Division Two of the Second Appellate District very recently held that provisions of the Education Code governing teacher tenure and dismissal do not violate the equal protection provision of the California Constitution. As pointed out in Gordon, *supra,* proper interpretation of article IX may provide a remedy for deficiencies that cannot be addressed under the equal protection provision.

relief. I would not at this preliminary stage attempt to predict the outcome of further proceedings, but I do not assume that no meaningful relief is possible.

It is true that the experience in some states where the courts have ordered relief has not been entirely positive. In the State of Washington, the Supreme Court has held the state in contempt for failing to comply with its orders. (*McCleary v. State of Washington* (Supreme Ct. No. 84362-7, Order Sept. 11, 2014.) In Kansas, school closings have been threatened as the result of judicial intervention. (Eveld, *Kansas Supreme Court voices aggravation at Legislature in school funding case*, The Kansas City Star (Nov. 6, 2015) <http://www.kansascity.com/news/local/article43417731.html> [as of Apr. 20, 2016].) Litigation in Texas has given rise to multiple decisions from the Texas Supreme Court since 1989, producing this dissenting opinion in 2005: "Of course, the true goal of this litigation is to put pressure on the Texas Legislature. We demanded legislative changes by holding the Texas school-finance system unconstitutional in [three separate cases] . . . [and] warned that we might do so again soon in [two other cases]. The Court fulfills that threat today. But there is no end in sight; if the past is any indication, the new funding will not last long, and public education will not change much." (*Neeley v. West Orange-Cove Consolidated Independent School Dist., supra,* 176 S.W.3d at pp. 800-801 (dis. opn. of Brister, J.), fns. omitted.) Litigation in those states is still ongoing, however, so that it cannot yet be said to what extent the court's involvement will have improved the quality of education in those jurisdictions.

In other states extended litigation following the court's recognition of a constitutional mandate for quality education has produced meaningful improvements in the educational system. In Massachusetts, for example, in 1993 its highest court directed entry of a declaration that the provisions of the Commonwealth's constitution "impose an enforceable duty on the magistrates and Legislatures of this Commonwealth to provide education in the public schools for the children there enrolled" and "that the constitutional duty is not being currently fulfilled by the Commonwealth." (*McDuffy v. Secretary of Executive Office of Education, supra,* 615 N.E.2d at p. 555.) The court articulated broad guidelines, and "assume[d] that the Commonwealth will fulfill its duty

19

to remedy the constitutional violations that [it] identified." (*Id.* at p. 554.) The court declared that "it is the responsibility of the Commonwealth to take such steps as may be required in each instance effectively to devise a plan and sources of funds sufficient to meet the constitutional mandate"(*id.* at pp. 555-556) and authorized the lower court to "retain jurisdiction to determine whether, within a reasonable time, appropriate legislative action has been taken" (*id.* at p. 556). In 2005, although the lower court had ruled that the state had not yet fully met its constitutional obligations, a majority of the Massachusetts Supreme Judicial Court concluded, "In the twelve years since *McDuffy* was decided, the elected branches have acted to transform a dismal and fractured public school system into a unified system that has yielded, as the judge found, 'impressive results in terms of improvement in overall student performance.' She found that 'spending gaps between districts based on property wealth have been reduced or even reversed. The correlation between a district's median family income and spending has also been reduced.' Public dollars for public education are now being allocated to where they are the most effective: defining core educational goals for all students, evaluating student performance toward those goals, and holding schools and school districts accountable for achieving those goals. . . . A system mired in failure has given way to one that, although far from perfect, shows a steady trajectory of progress." (*Hancock v. Commissioner of Educ.* (2005) 443 Mass. 428 [822 N.E.2d 1134, 1138-1139].)

In New York, the high court's ruling that the education article of their state constitution "require[d] the State to offer all children the opportunity for a sound basic education" (*CFE I, supra*, 655 N.E.2d at p. 661) led to a trial at which it was determined that inadequate funding caused New York City children not to receive that opportunity (*CFE II, supra,* 801 N.E.2d at p. 340- 344). The court directed the state to ensure by means of "[r]eforms to the current system of financing school funding and managing schools . . . that every school in New York City would have the resources necessary for providing the opportunity for a sound basic education." (*Id.* at p. 348.) The court directed the state to ascertain the actual cost of providing a sound basic education in New York City, rather than the state as a whole, and set a deadline to implement its directive.

(*Id.* at pp. 348-349.)  In response, the Governor promptly issued an executive order creating the New York State Commission on Education Reform, charged with recommending education financing and other reforms that would ensure that all children in New York State have an opportunity to obtain a sound basic education." (*CFE III, supra,* 861 N.E.2d at p. 53.)  Based on a methodology explained in *CFE III,* and the resulting estimated "spending gaps," the Governor proposed legislation to provide increased funding to fill those gaps.  That legislation was not initially enacted (*id.* at p. 55), but according to the 2007 Update from the New York State Assembly Education Committee, "in response to the Campaign for Fiscal Equity, Governor Eliot Spitzer and the legislature dedicated hundreds of millions of taxpayer dollars to education in a revised formula which made high-needs children the state's priority.  The City of New York will benefit greatly from this new approach." (Rep. Nolan, Chair (Dec. 2007) <http://assembly.state.ny.us/comm/Ed/20071030> [as of Apr. 20, 2016].)

I would not presume to predict the long-term consequences of permitting plaintiffs' disturbing allegations to be examined at trial and the appropriateness of any remedy for confirmed inadequacies evaluated on appeal.  I conclude only that plaintiffs have alleged on-going violations of our state Constitution, that it is the responsibility of the courts to adjudicate the merits of that claim, that the courts are capable of fulfilling that responsibility, and that, should plaintiffs' allegations be proven, the potential for meaningful relief cannot be dismissed.  It may well be that the extent to which proven deficiencies in California's educational system ultimately are corrected will depend on the good faith of legislators and other public officials and the play of political forces.  Nonetheless, I would not assume that a judicial edict, entered and upheld after the searching inquiry demanded by our court system, would be for naught.

21

I would therefore reverse the order sustaining demurrers and granting judgment on the pleadings as to the causes of action alleging the ongoing violation of section 5 of article IX of the California Constitution, and remand so that the accuracy of plaintiffs' allegations can be fully evaluated and appropriate relief thoughtfully considered.

_____

Pollak, Acting P.J.

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Steven A. Brick |
| Counsel for Appellants: Campaign for Quality Education et al.: | John Thomas Affeldt, Tara Kini, Sophia Lai; PUBLIC ADVOCATES, INC. *(Counsel for CQE Plaitiffs/Appellants)* <br><br> Martin R. Glick <br> Deborah S. Schlosberg <br> Sara J. Eisenberg <br> Gabriel N. White <br> Steven L. Mayer <br> ARNOLD & PORTER LLP *(Counsel for CQE Plaitiffs/Appellants)* <br><br> Rohit Kumar Singla <br> Leo Goldbard <br> MUNGER TOLLES & OLSON *(Counsel for CQE Plaitiffs/Appellants)* |

| | |
|---|---|
| Counsel for Appellants:<br>Robles-Wong et al.: | Frank B. Kennamer, Sandra Z. Nierenberg,<br>Gretchen E. Groggel, Elisa Cervantes;<br>BINGHAM McCUTCHEN LLP<br>*(Counsel for Robles-Wong Individual Plaintiffs Appellants*<br><br>Deborah B. Caplan, Joshua R. Daniels, Matthew R. Cody<br>OLSON, HAGEL & FISHBURN, LLP<br>*(Counsel for Robles-Wong, CSBA, ACSA, STATE PTA, and School Districts)*<br><br>Abe Hajela<br>*(Counsel for Robles-Wong, CSBA, ACSA and California State PTA)*<br><br>William S. Koski, Carly J. Munson;<br>YOUTH AND EDUCATIONAL LAW PROJECT<br>MILLS LEGAL CLINIC, STANFORD LAW SCHOOL<br>*(Counsel for Robles-Wong, Individual Plaintiffs/Appellants)*<br><br>William F. Abrams<br>KING & SPALDING<br>*(Counsel for Robles-Wong, Individual Plaintiffs/Appellants)*<br><br>Laura P. Juran<br>Jean Shin<br>CALIFORNIA TEACHERS ASSOCIATION<br>*(Counsel for Appellant-Intervener CTA and Robles-Wong)* |
| Counsel for Respondent:<br>State of California | Edmund G. Brown Jr., as Governor<br>Ana Matosantos, as Director of Finance<br>John Chiang, as State Controller<br>Kamala D. Harris, Attorney General of California<br>Julie Weng-Guiterrez, Senior Assistant Attorney General<br>Nimrod Elias, Ernest Martinez, Lisa Tillman, Jonathan E. Rich, Joshua Nathan Sondheimer, Pauline Gee<br>Ismael A. Castro, Supervising Deputy Attorney General |

| | |
|---|---|
| Counsel for Amicus curiae for Appellants:<br>Education Law Center and Campaign for Educational Equity, Teacher's College, Columbia University | Stephen R. Buckingham<br>Alison Price Corbin<br>LOWENSTEIN SANDLER LLP<br><br>Rochelle Lyn Wilcox<br>DAVIS WRIGHT TREMAINE LLP |
| Counsel for Amicus curiae for Appellants:<br>California Rural Legal Assistance, Inc. | Cynthia Louise Rice<br>Franchesca Gonzalez<br>CALIFORNIA RURAL LEGAL ASSISTANCE, INC.<br>*(Counsel for Amici Curiae, Maria Medina)*<br><br>Santiago Avila-Gomez<br>CALIFORNIA RURAL LEGAL ASSISTANCE, INC.<br>*(Counsel for Amici Curiae, Californians Together)* |
| Counsel for Amicus curiae for Appellants:<br>Delaine Eastin and Jack O'Connell in support of Plaintiff/Appellants: | Steven D. Allison, David D. Johnson,<br>Tracy E. Reichmuth, Joel D. Smith<br>CROWELL & MORING<br>*(Counsel for Amicus curiae Delaine Eastin and Jack O'Connell)* |
| Counsel for Amicus curiae for Appellants:<br>Fight Crime: Invest in Kids California | Cameron G. Stout, Douglas Karpa, Daniel R. Golub<br>HOLLAND & KNIGHT LLP<br>*(Counsel for Amicus Curiae Fight Crime: Invest in Kids California)* |
| Counsel for Amicus curiae for Appellants:<br>Children Now, Education Trust-West & California Association of School Business Officials | Nicole S. Cuningham<br>Nicole S. Naghi<br>GOODWIN PROCER LLP<br>*(Counsel for Children Now, Education Trust-West & California Association for School Business Officials)* |

Court of Appeal, First Appellate District, Division Three - Nos. A134423/A134424

**S234901**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

CAMPAIGN FOR QUALITY EDUCATION, Plaintiff and Appellant,

v.

STATE OF CALIFORNIA et al., Defendants and Respondents;

AND CONSOLIDATED CASE.

_____

The petition for review is denied.

Chin, Liu and Cuéllar, JJ., are of the opinion the petition should be granted.


                                      _____
                                                    *Chief Justice*


DISSENTING STATEMENT

by Liu, J.


      The question at the heart of this case is whether California's K-12 education system has fallen below a minimum level of quality guaranteed by our state Constitution. The plaintiffs include dozens of students of various races, ethnicities, and socioeconomic backgrounds, from first graders to twelfth graders, all of whom attend public schools throughout the state. Citing a wide range of studies and indicators, these schoolchildren allege that the state is failing to provide access to a meaningful education that prepares them to meet the state's academic standards, to achieve economic and social success, and to participate in the political and civic life of their communities. This failure, they

1

contend, violates the education clauses of the California Constitution. (Cal. Const., art. IX, §§ 1 ["A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement."], 5 ["The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established."].)

The Court of Appeal, in a 2-1 decision, affirmed the trial court's dismissal of the complaints. (*Campaign for Quality Education v. State of California* (2016) 246 Cal.App.4th 896 (*Campaign for Quality Education*).) The panel produced three opinions. The majority, in an opinion by Justice Jenkins, held that "sections 1 and 5 of article IX do not provide for an education of 'some quality' that may be judicially enforced by appellants." (*Id.* at p. 906.) Those provisions, the majority explained, "do not allow the courts to dictate to the Legislature, a coequal branch of government, how to best exercise its constitutional powers to encourage education and provide for and support a system of common schools throughout the state." (*Id.* at pp. 915–916.) Justice Siggins, in a concurring opinion, took the view that "the academic standards articulated in our Education Code" essentially define "the constitutional right to a quality education" and that any claims of systemic inadequacy "should arise under the statutes . . . without resort to the general language of article IX." (*Id.* at p. 918 (conc. opn. of Siggins, J.).) Justice Pollak dissented, saying that "if [article IX] is to have meaning, it must imply that the system of common schools must provide some minimum qualitative level of education. Such a reading of article IX is fully consistent with, if not compelled by, the importance that our Supreme Court historically has placed on the role of education and the recognition that it is a fundamental right of all the state's children." (*Id.* at p. 922 (dis. opn. of Pollak, J.).)

Because this case presents unsettled questions of the utmost importance to our state and its schoolchildren, the petition before us readily meets our criteria for review. We are clearly being asked "to settle an important question of law." (Cal. Rules of Court, rule 8.500(b)(1).) Plaintiffs have made serious allegations of chronic deficiencies in California's K-12 education system, and they have asserted constitutional claims that only this court can definitively resolve. The issues are ones that divided our colleagues in the Court of Appeal, whose three opinions illuminate the momentous and complex nature of the controversy. That court ultimately held that the constitutional adequacy of the largest function of our state government is not an issue within the judiciary's purview. A holding of this magnitude, whether correct or not, warrants a full and reasoned examination by the state's highest court.

The high courts in more than two-thirds of the states have addressed these issues over the past three decades in cases arising under the education clauses of their state constitutions. A substantial majority of these courts have decided it is their duty to

resolve the constitutional issues; the minority that have found the issue nonjusticiable have done so in published opinions. Many courts have articulated standards for educational adequacy, and such standards have led to progress in some states but not others. All of this experience is available to aid our resolution of this case. Yet this court today decides that the issues presented do not merit our review.

It is not the judiciary's job to make educational policy or to run the public schools. Those functions are constitutionally committed to the political branches (Cal. Const., art. IX, §§ 1–3, 5, 7), and no system will ever be perfect. But plaintiffs do not complain of mere imperfections. They allege that systemic deficiencies have deprived large numbers of children of the most basic educational opportunities, have disproportionately harmed the least advantaged children, and have persisted not only for years but for decades — even as "there can be no doubt that the fundamental right to a public school education is firmly rooted in California law . . . ." (*Campaign for Quality Education*, *supra*, 246 Cal.App.4th at p. 906.) It is regrettable that this court, having recognized education as a fundamental right in a landmark decision 45 years ago (*Serrano v. Priest* (1971) 5 Cal.3d 584), should now decline to address the substantive meaning of that right. The schoolchildren of California deserve to know whether their fundamental right to education is a paper promise or a real guarantee. I would grant the petition for review.

## I.

In order to understand the significance of this case, it is useful to have some historical context. Fifty years ago, California's public schools were the envy of the nation. As an eminent scholar of California history has written, "[i]n the so-called Golden Age following World War II, the schools of California were considered among the best in the nation, and test scores proved it." (Starr, California: A History (2005) p. 335.) During that period, "[p]ublic schools were being built by the hour, and dedicated. And public school architecture was at its best. An entire generation of talented young men and women went into public school teaching and administration. There was a sense that a utopia was being formed in the classroom." (Learning Matters, *First to Worst* (2004) [video program; Kevin Starr interview].) So confident were the state's leaders in the educational future of California's schoolchildren that they devised and executed a "Master Plan" to build what many regard as the best public university system in the world. (Starr, Golden Dreams: California in an Age of Abundance (2009) pp. 217–244.)

"But by the early 1990s, California had dropped to the lowest rankings in terms of scores and dollars spent on K-12 education. In 1993, for example, fourth-graders in California were vying with fourth-graders in Mississippi for the dubious distinction of being the worst readers in the nation." (Starr, California: A History, *supra*, at p. 335.) This decline of California's K-12 education system, as the student population has become more diverse, is well-documented. (See Carroll et al., Rand Corp., California's K-12 Public Schools: How Are They Doing? (2005).) For two decades now, California has

3

trailed most states on student achievement and education funding.  (See *Quality Counts*, Education Week (1997–2016) <http://www.edweek.org/ew/qc/> [as of Aug. 22, 2016].)  The allegations in the complaints, which we must accept as true at this stage of the litigation (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081), paint a sobering picture.

According to one of the complaints (there are two in this case), "[d]espite having one of the most diverse and challenging student population [*sic*] in the nation, California per pupil spending in 2008-09 was $2,131 below the national average, ranking the State 44th in the country.  California's per pupil spending was less than each of the largest 10 states in the nation, with New York spending almost $6,000 more per pupil."  The staffing of California's public schools reflects the state's low spending levels.  In 2007–2008, plaintiffs allege, "California ranked at or near the bottom in the nation in staffing ratios:  49th in total school staff; 47th in principals and assistant principals; 49th in guidance counselors; 50th in librarians; and 49th in access to computers.  California educates over 1.7 million students more than Texas, but does so with 16,700 fewer teachers."

The test scores of California students, on average and disaggregated by subgroups, are among the lowest in the nation, as measured by the federally administered National Assessment of Educational Progress.  On the 2009 assessment, one complaint alleges, "California tied for 47th of fourth grade reading and tied for 46th in eighth grade math.  [¶] Academic performance is low for all subgroups of students.  Even for students who are not academically disadvantaged, California ranks tied for 43rd in fourth grade reading and tied for 41st in eighth grade math.  For California students whose parents graduated from college, the rank is still 40th in fourth grade reading and 39th in eighth grade math. . . .   [¶] . . . California's economically disadvantaged students rank 49th in fourth grade reading and 48th in eighth grade math when compared to economically disadvantaged students in other states."

In addition, plaintiffs allege, large majorities of our African American, Latino, and low-income students as well as English learners do not achieve proficiency according to the state's own academic standards:  "In 2008-09, only 50% of California's students were proficient in English-Language Arts; only 37% of African-American students, 37% of Hispanic students, 36% of economically disadvantaged students, and 20% of English Learners reached this level.  Only 46% of California's students were proficient in Mathematics; this percentage dropped to 30% for African-American students, 36% for Hispanic students, 37% for economically disadvantaged students, and 32% for English Learners.  By eleventh grade, students in these groups had fallen even farther – in English language Arts, only 25% of African-American students, 26% of Hispanic students and economically disadvantaged students, and 5% of English Learners reached proficiency."

4

Moreover, according to one complaint, California sends a smaller percentage of its high school graduates to four-year colleges and universities than all but three states: "Of those California students who do graduate from high school, many fail to successfully complete the course requirements (known as 'A-G requirements') needed to even *apply* for admission to California's four-year public universities. Of 550,000 students who enrolled in California public schools as ninth graders in the fall of 2004, only about one quarter completed the A-G requirements and graduated eligible for a four-year college or university. [Rogers et al., California Educational Opportunity Report (2010) p. 7]. . . . [¶] Among those graduates who do gain admission into California's university system, many are unprepared to succeed there. Sixty percent of freshmen in the California State University system are not proficient in either Math or English, or both, and beginning in 2012, will be required to take remedial courses in these subjects before they can begin college."

Although the legislative process has produced a variety of education initiatives over the years, none has yet to substantially reverse these indicators. The passage of Proposition 98 in 1988 and Proposition 111 in 1990, which guarantee K-12 education a minimum share of the state's General Fund, was arguably the last time the policymaking process sought to establish a constitutional minimum for the state's commitment to public schools. (Cal. Const., art. XVI, § 8.) In 1992, the Legislature passed the Charter Schools Act, which launched the growth of charter schools in California. (Ed. Code, § 47600 et seq.) In 1996, the Legislature enacted the Class Size Reduction program, which seeks to limit class sizes to 20 students per certificated teacher. (Ed. Code, former § 52120 et seq.) In 1999, the Legislature passed the Public School Accountability Act, which set the stage for California's compliance with the federal No Child Left Behind Act of 2001 by introducing a comprehensive system of assessments and accountability mechanisms to track and facilitate student progress toward statewide academic standards. (Ed. Code, § 52050 et seq.) Also in 1999, the Legislature created the California High School Exit Exam (Stats. 1999, 1st Ex. Sess. 1999–2000, ch. 1, § 5, p. 8075), but in 2015, the Legislature suspended it, and it is no longer a condition of receiving a diploma (Stats. 2015, ch. 572, § 1).

More recently, the voters in 2012 passed Proposition 30, which imposed temporary tax increases to support K-12 education and community colleges. (Cal. Const., art. XIII, § 36, subd. (e).) And in 2013, the Legislature restructured the school finance system by creating the Local Control Funding Formula, which is designed to improve the ability of school districts to flexibly use state education dollars to address the most pressing areas of need. (Ed. Code, § 42238.02.) Each district now receives a base funding allocation per student, plus supplemental funding depending on the district's population of English learners and low-income students as well as the concentration of those students in the district. (*Ibid.*)

As these efforts suggest, educational policymaking in California has not been a tale of intransigence. At the state and local levels, many educational leaders have labored mightily to provide all children with access to a decent education, and we should not ignore their successes. (See Cal. Dept. of Education Success Stories <http://www.cde.ca.gov/nr/re/ss/> [as of Aug. 22, 2016].) However, as the complaints allege, the past two decades have not produced a tale of overall efficacy either. It is of course unrealistic to expect a major turnaround of any large school system to occur overnight; such "miracles" are properly met with skepticism. But some states have made significant gains in education over the past 20 years (see Hanushek et al., Achievement Growth: International and U.S. State Trends in Student Performance (2012) pp. 5–16), even as student achievement in California, despite some progress, has remained generally low.

It is against this backdrop that plaintiffs have turned to the courts for an elaboration of the Legislature's duty to provide for a system of common schools. The schoolchildren who brought these actions do not claim they are entitled to a world-class education. They ask only whether the California Constitution protects them from being deprived of a minimally adequate education. They are asking the judiciary, as the ultimate guarantor of constitutional rights, to define and safeguard their fundamental right to education.

## II.

Despite recognizing that education is a fundamental right under the California Constitution, the Court of Appeal found "no explicit textual basis [in section 1 or section 5 of article IX] from which a constitutional right to a public school education of a particular quality may be discerned." (*Campaign for Quality Education*, *supra*, 246 Cal.App.4th at p. 909.) The court said that section 1 is " 'general and aspirational' " and that section 5 does not " 'delineate or identify any specific outcome standards.' " (*Id.* at pp. 908–909.) The court also refused to read sections 1 and 5 together to find a right to an education of some quality. (*Id.* at p. 909.) Further, the Court of Appeal invoked separation of powers principles in finding the controversy nonjusticiable, concluding that " '[t]he quandary described in the complaint[s] is lamentable, but the remedy lies squarely with the Legislature, not the judiciary.' " (*Id.* at p. 916.)

As Justice Pollak argued in dissent, there is significant reason to question the Court of Appeal's holdings that article IX's education clauses do not imply any minimum standard of quality and do not impose any duties on the Legislature that are judicially discernible or enforceable. These holdings reflect the minority view among the more than 30 state high court opinions addressing similar issues under their state constitutions. (See *Campaign for Quality Education*, *supra*, 246 Cal.App.4th at p. 920 (dis. opn. of Pollak, J.) ["The different outcomes [among state high courts] result less from differences in the wording of the respective constitutions than from different perceptions of the role

6

properly played by the courts in overseeing compliance with the state's basic charter."].)
A significant number of these courts have recognized a judicially enforceable right to an
adequate education. The adequacy standards articulated by the high courts of
Connecticut, Kansas, Kentucky, Massachusetts, New Jersey, New York, South Carolina,
Texas, Washington, West Virginia, and Wyoming are reviewed in Justice Pollak's
dissent. (*Id.* at pp. 925–929, citing *Conn. Coalition for Justice in Education Funding,
Inc. v. Rell* (Conn. 2010) 990 A.2d 206; *Gannon v. State* (Kan. 2014) 319 P.3d 1196;
*Rose v. Council for Better Education* (Ky. 1989) 790 S.W.2d 186; *McDuffy v. Secretary
of Education* (Mass. 1993) 615 N.E.2d 516; *Robinson v. Cahill* (N.J. 1973) 303 A.2d
273; *Campaign for Fiscal Equity, Inc. v. State of New York* (N.Y. 2003) 801 N.E.2d 326;
*Abbeville County School Dist. v. State* (S.C. 2014) 767 S.E.2d 157; *Neeley v. West
Orange-Cove Consolidated Independent School Dist.* (Tex. 2005) 176 S.W.3d 746;
*McCleary v. State* (Wn. 2012) 269 P.3d 227; *Pauley v. Kelly* (W.Va. 1979) 255 S.E.2d
859; *Campbell County School Dist. v. State* (Wyo. 1995) 907 P.2d 1238; see also *Lake
View School Dist. No. 25 of Phillips County v. Huckabee* (Ark. 2002) 91 S.W.3d 472;
*Claremont School Dist. v. Governor* (N.H. 1993) 635 A.2d 1375.) These decisions
"demonstrate that courts are capable of articulating such a standard, albeit a standard that
is general and requires intensive factual analysis to apply." (*Campaign for Quality
Education*, at p. 925 (dis. opn. of Pollak, J.).)

Justice Pollak concluded "that the provisions of our state Constitution requiring
the state to support a system of common schools is not without substance, and that the
Constitution requires a system that provides students with a meaningful basic education
in reality as well as on paper. . . . [A] standard such as those articulated in the opinions
quoted above, though general, permits meaningful evaluation of a school system by
educational professionals and experts." (*Campaign for Quality Education*, *supra*, 246
Cal.App.4th at p. 929 (dis. opn. of Pollak, J.).) Judicial formulation of broad and general
standards "reflects not only the 'recognition of the political branches' constitutional
responsibilities, and indeed, greater expertise, with respect to the implementation of
specific educational policies' and that 'the specific educational inputs or instrumentalities
suitable to achieve this minimum level of education may well change over time,' but that
'like any other principle of constitutional law, this broad standard likely will be refined
and developed further as it is applied to the facts eventually to be found at trial in this
case.' " (*Id.* at pp. 929–930.)

Apart from its concerns about formulating an adequacy standard, the Court of
Appeal worried that adjudication of plaintiffs' claims would potentially put the judiciary
on a collision course with the Legislature in violation of the separation of powers. Two
points from Justice Pollak's dissent are pertinent here.

First, "[t]o a large extent," this worry "rest[s] on the premise that plaintiffs are
seeking to compel the California Legislature to appropriate additional funds for K-12
education, which is beyond the constitutional province of the judiciary." (*Campaign for*

7

*Quality Education*, *supra*, 246 Cal.App.4th at p. 931 (dis. opn. of Pollak, J.).) However, "[p]laintiffs do not allege simply that the amount of funds appropriated to the schools is insufficient, but that the system by which funds are allocated among schools and school districts is significantly responsible for the inadequacies in the educational system." (*Ibid.*) Further, "[p]laintiffs allege that the present system incorporates inadequate teacher training, and some plaintiffs also attribute deficiencies to the methods of teacher evaluation, promotion and discipline." (*Id.* at p. 932.) At this point, it is far from clear that any remedy for a proven violation would require the courts to order increased spending on education. "[A]s the experience in other states confirms, various forms of relief are available short of ordering the legislature to appropriate funds. Courts have required plans to be developed to address and correct adjudicated deficiencies. The intensive examination of the system that trial of plaintiffs' allegations would necessarily entail may be expected to yield other specific forms of relief." (*Id.* at pp. 932–933.) Indeed, it may be that reforms designed to make more efficient use of existing funds would provide an important measure of relief if plaintiffs were to prove a violation. (See *id.* at pp. 918–919 (conc. opn. of Siggins, J.) ["the balance between more resources and operational and organizational change in the schools may need to be differently struck"]; *Vergara v. State of California* (2016) 246 Cal.App.4th 619, 640–641 [trial court found that hiring and retention of grossly ineffective teachers severely hamper students' educational progress].)

Second, and more fundamentally, whatever limitations on judicial authority may constrain a court's ability to order remedies for proven violations, "[w]e need not presume that the Legislature will fail to respond appropriately if the court should ultimately determine that the Constitution is being violated by the lack of sufficient funding." (*Campaign for Quality Education*, *supra*, 246 Cal.App.4th at p. 932 (dis. opn. of Pollak, J.).) Although courts in some states have clashed with their legislatures over educational adequacy remedies (e.g., Kansas and Washington), there are also examples of such litigation resulting in interbranch collaboration and important reform (e.g., Kentucky and Massachusetts). Like Justice Pollak, "I would not presume to predict the long-term consequences of permitting plaintiffs' disturbing allegations to be examined at trial and the appropriateness of any remedy for confirmed inadequacies evaluated on appeal. . . . It may well be that the extent to which proven deficiencies in California's educational system ultimately are corrected will depend on the good faith of legislators and other public officials and the play of political forces. Nonetheless, I would not assume that a judicial edict, entered and upheld after the searching inquiry demanded by our court system, would be for naught." (*Id.* at p. 935.)

This last point bears emphasis. The potential for conflict between courts and the political branches is inherent in the power of judicial review. Even so, "[i]t is emphatically the province and duty of the judicial department to say what the law is." (*Marbury v. Madison* (1803) 5 U.S. 137, 177; see *Marin Water & Power Co. v. Railroad Com.* (1916) 171 Cal. 706, 711–712 ["The judicial function is to 'declare the law and

8

define the rights of the parties under it.' "].)  I do not underestimate the uncertainties that might attend a judicial declaration of the law in this context.  But it has always been the case that "[t]he judiciary . . . has no influence over either the sword or the purse . . . .  It may truly be said to have neither Force nor Will, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments."  (The Federalist No. 78 (Cooke ed., 1961) p. 523 (Hamilton).)  We ought to proceed in this case, as we do in all constitutional cases, with a strong presumption that public officials — having taken the same oath we have taken to "support and defend the Constitution of the United States and the Constitution of the State of California" (Cal. Const., art. XX, § 3) — will work in good faith to effectuate any judgment duly entered by the courts.  This understanding is not only a matter of the respect we owe the coordinate branches of government, but also an essential underpinning of the rule of law as practiced in our constitutional tradition.

## III.

The challenges facing California's K-12 education system remain within the purview of the Governor, the Legislature, the Superintendent of Public Instruction, and other state and local officials.  This court's passivity in the face of plaintiffs' claims should not be understood as an implied judgment that those claims are unmeritorious or unfit for judicial resolution.  Our denial of review suspends, for now, the prospect of judicial elaboration of what the fundamental right to education entails.  But it is possible that the complexion of the issue and, in turn, this court's posture may change if our education system further stagnates or worsens.

At the same time, my vote to grant review should not be construed as a judgment that plaintiffs have established a constitutional violation.  Apart from the unsettled questions of justiciability and interpretation of article IX, plaintiffs' allegations have not been tested at trial, and it appears that some of the conditions alleged in the complaints have changed.  Since 2010, the year plaintiffs filed their complaints, state funding of K-12 education has risen significantly.  Proposition 98 funding per pupil is projected to exceed $10,000 in 2015–2016, a 28 percent real increase since 2010–2011.  (Legis. Analyst, The 2016-17 Budget, EdBudget Tables, K-12 Education, K-12 Proposition 98 Funding Per Pupil <http://lao.ca.gov/Publications/Report/3326#8> [as of Aug. 22, 2016].)  The current budget returns our K-12 system to the funding level that existed in 2007–2008, before the economic downturn.  (*Ibid.*)  Whether education funding will continue its current upward trajectory remains to be seen.  (See Cal. Const., art. XIII, § 36, subd. (f) [Proposition 30's tax increases to fund education will expire in 2016 (sales tax) and 2018 (personal income tax)].)

As a result of the Local Control Funding Formula, enacted in 2013, a significant portion of education dollars are now allocated to districts according to their numbers of low-income students and English learners as well as the concentration of those students

9

in the district. (Ed. Code, § 42238.02.) The formula replaced what many believed to be an outdated and arbitrary funding scheme with a more rational and equitable distribution. School districts now have more discretion in spending their funds, and each district is responsible for adopting a three-year local control and accountability plan. (*Id.*, § 52060 et seq.) This devolution of control and accountability marks a pronounced shift from the decades of centralized education governance catalyzed by Proposition 13 and reinforced by the federal No Child Left Behind Act. Time will tell whether these reforms prove effective.

Meanwhile, student achievement remains low. On the 2015 National Assessment of Educational Progress, California ranked 48th in fourth-grade math, 49th in fourth-grade reading, 41st in eighth-grade math, and 44th in eighth-grade reading. (U.S. Dept. of Education, Nat. Center for Education Statistics, NAEP State Comparisons <http://nces.ed.gov/nationsreportcard/statecomparisons/> [as of Aug. 22, 2016].) These low rankings persist when test scores are disaggregated by subgroups. In fourth-grade reading, for example, California students eligible for free or reduced-price lunch ranked 48th compared to their counterparts in other states; students who were not eligible ranked 40th. (*Ibid.*)

Although the initiatives above are significant, none of them directly addresses the fundamental question of adequacy at the heart of plaintiffs' complaints. Proposition 98 funding is designed to increase with growth in the economy and K-12 attendance, but the funding level is not based on what resources are needed to provide a minimally adequate education to all students. The Local Control Funding Formula aims to distribute funds more equitably according to student needs, but it does not purport to prescribe adequate funding levels.

In order to identify a concerted effort to examine the adequacy of California's K-12 education system, one has to go back a full decade. In 2005, a bipartisan group of state leaders — the President Pro Tem of the Senate, the Speaker of the Assembly, the Superintendent of Public Instruction, the Governor's Committee on Education Excellence, and the Secretary of Education — commissioned a comprehensive review of California's school finance and governance systems. Funded by four major foundations, this initiative enlisted dozens of scholars throughout California and the nation, and resulted in over 20 research papers not only on resource adequacy and equity, but also on state and local governance, teacher policies, and data and information systems. (Stanford Center for Education Policy Analysis, Getting Down to Facts <https://cepa.stanford.edu/ gdtf/overview> [as of Aug. 22, 2016].) This unprecedented body of research was completed in 2007, but its potential impact in the policymaking arena was largely eclipsed by a severe recession. Now that economic conditions have improved, there have been calls to renew the wide-ranging inquiry that began a decade ago. (Cal. School Boards Assn., California's Challenge: Adequately Funding Education in the 21st Century (2015).)

Today this court declines to decide whether our state Constitution lends urgency or guidance to such inquiry. This is unfortunate given what is at stake. In *Serrano v. Priest*, *supra*, 5 Cal.3d 584, we described "the indispensable role which education plays in the modern industrial state. . . . [F]irst, education is a major determinant of an individual's chances for economic and social success in our competitive society; second, education is a unique influence on a child's development as a citizen and his participation in political and community life. . . . Thus, education is the lifeline of both the individual and society." (*Id.* at p. 605.) We quoted *Brown v. Board of Education* (1954) 347 U.S. 483, 493: " 'Today, education is perhaps the most important function of state and local governments. . . . It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.' " (*Serrano v. Priest*, at p. 606.)

We should not leave the schoolchildren of California to wonder whether their fundamental right to education under our state Constitution has real content or is simply hortatory. The policymaking process may eventually address plaintiffs' claims, or it may not. Plaintiffs urge this court to clarify the state's obligation. They seek an education system that is truly capable of fulfilling its vital role for all children of the Golden State. These issues, however we might resolve them, deserve this court's full consideration.

I respectfully dissent from the denial of review.


DISSENTING STATEMENT

by Cuéllar, J.


Time and again we have emphasized how fundamental the right to education is for California. (See *Butt v. State of California* (1992) 4 Cal.4th 668, 686 ["education is . . . a fundamental interest for purposes of equal protection analysis under the California Constitution"]; *Serrano v. Priest* (1971) 5 Cal.3d 584, 608-609 ["the distinctive and priceless function of education in our society warrants, indeed compels, our treating it as a 'fundamental interest' "].) And rightly so: Meaningful access to public education is foundational not only to economic opportunity for millions of students, but to our shared civic life. But what good are such judicial exhortations if that right has no meaningful content?

Arguing that such content must exist to render meaningful the fundamental right to education, plaintiffs allege that the California public schools fail to provide large

11

numbers of students with a level of minimally acceptable education in violation of article IX of the California Constitution.[1] According to plaintiffs, California does too little to define a minimally adequate education for its students. It ranks at or near the bottom relative to other states in terms of educational outcomes and staffing ratios. It provides inadequate teacher training, and fails to provide the resources students need to succeed. As a result of these deficiencies, plaintiffs allege, California students are directly harmed: nearly two-thirds of low-income and minority students fail to meet the state's own standard of proficiency in mathematics or language arts; and fewer than 60 percent of African-American and Latino students even graduate from high school. (See *Campaign for Quality Education v. State of California* (2016) 246 Cal.App.4th 896, 924-925 (dis. opn. of Pollak, J.).)

Whether plaintiffs could have proven as much at trial — this case having been squelched at the pleading stage — remains unanswered. So do the important questions of state constitutional law presented by this case that our court is best suited to resolve. (See Cal. Rules of Court, rule 8.500(b)(1).) Indeed, the question whether our state Constitution demands *some* minimum level of educational quality, as opposed to resolving precisely how schools should be administered, lies at the core of what this institution is empowered to adjudicate. And because plaintiffs' claims here concern a range of state activities affecting education, the key question in this case implicates more than simply an exercise in defining the appropriate level of funding or of any other single input to support an adequate education.

We consider that question against the backdrop of separation of powers principles that are vital to our government. Yet never have these principles meant that we should strain to avoid our responsibility to interpret the state Constitution simply because the right at issue touches on concerns the Legislature might ultimately address, or because the task of resolving a case implicating the right to education demands careful attention to the proper role of courts as well as our sister branches. We routinely treat as justiciable those challenges based on other fundamental rights, such as the right to marry, vote, or engage in free speech. (See, e.g., *In re Marriage Cases* (2008) 43 Cal.4th 757, 809 [right to marry]; *Fashion Valley Mall, LLC v. National Labor Relations Board* (2007) 42 Cal.4th 850, 865 [right to free speech]; *Gould v. Grubb* (1975) 14 Cal.3d 661, 670 [right to vote].) The right to education is no less fundamental, nor is it any less worthy of

---

[1] Section 1 of article IX of the California Constitution states: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement."

Section 5 of article IX of the California Constitution states: "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established."

12

protection.  Courts of other states, when faced with similar challenges based on this right, overwhelmingly agree.  (See, e.g., *Gannon v. State* (Kan. 2014) 319 P.3d 1196, 1226 ["Most state supreme courts have rejected the nonjusticiability argument . . ."].)

It is especially important for California's highest court to speak on this issue.  Our state educates one-eighth of all public school students in the country.  (See Nat. Ed. Assn., Rankings of the States 2015 and Estimates of School Statistics 2016 (May 2016) p. 11.)  Many of those kids who come from low-income families find themselves concentrated in particular schools or districts that, despite the best intentions, fail to deliver an education remotely worthy of the students they are serving.  These realities make it all the more critical that the representative branches play the crucial role that belongs to them, but with greater clarity about the scope of the right to education — clarity only this court can provide.

Respectfully, I would grant review.